# United States Court of Appeals
## For the First Circuit

No. 08-1799

UNITED STATES OF AMERICA,
Appellee,

v.

GABRIEL RIVERA-RODRÍGUEZ,
Defendant, Appellant.

No. 08-1822

UNITED STATES OF AMERICA,
Appellee,

v.

EXCEL A. MUÑIZ-MASSA,
Defendant, Appellant.

No. 08-1828

UNITED STATES OF AMERICA,
Appellee,

v.

EDUARDO PABÓN-MANDRELL,
Defendant, Appellant.

No. 08-1960

UNITED STATES OF AMERICA,
Appellee,

v.

JOSÉ RIVERA-MORENO,
Defendant, Appellant.

UNITED STATES OF AMERICA,
Appellee,

v.

CHRISTIAN ARZOLA-MARTÍNEZ,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

Anita Hill-Adames, for appellant Rivera-Rodríguez.
Raúl S. Mariani-Franco, for appellant Muñiz-Massa.
Rafael F. Castro-Lang, for appellants Pabón-Mandrell and Arzola-Martínez.
Rosa I. Bonini-Laracuente, for appellant Rivera-Moreno.
Luke V. Cass, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief for appellee.

August 25, 2010

**TORRUELLA**, **Circuit Judge**.  Gabriel Rivera-Rodríguez ("Rivera-Rodríguez"), Excel Muñiz-Massa ("Muñiz-Massa"), Eduardo Pabón-Mandrell ("Pabón-Mandrell"), José Rivera-Moreno ("Rivera-Moreno"), and Christian Arzola-Martínez ("Arzola-Martínez"), (collectively "Appellants") were convicted by a jury of a drug trafficking conspiracy.  Appellants were later sentenced to lengthy prison terms.

On appeal, Appellants challenge both their convictions and sentences.  They advance a spate of claims in the process, including challenges to certain evidentiary rulings the district court made, challenges to the sufficiency of the evidence underlying their convictions, a challenge to the ex parte communications the district judge conducted with prospective jurors during voir dire, and challenges to the district court's sentencing process and outcomes.  After careful review of the record, we find that the district court did not abuse its discretion regarding the evidentiary rulings and that the evidence adduced at trial was sufficient for the jury to convict Arzola-Martínez, Muñiz-Massa, and Rivera-Moreno.  We also find that the ex parte conversations the district judge held with prospective jurors, though troubling, did not amount to plain error.  Moreover, we find that the district court did not err when it provided Arzola-Martínez with the opportunity to allocute during sentencing or when it found Rivera-Rodríguez individually responsible for at least 4.5 kilograms of

-3-

crack cocaine.  Finally, we find that the district court committed no error concerning the prior criminal histories of Arzola-Martínez or Pabón-Mandrell when calculating their sentences.  Given our findings, we affirm in all respects.

## I.   **Background and Procedural History**

### A.   **Indictment (2007)**

On March 19, 2007, a grand jury sitting in the District of Puerto Rico returned a two-count indictment against the five Appellants and thirty-seven other individuals.  Count One of the indictment charged that, between an unknown date ("but no later than in or about 2003") and 2007, the group of forty-two defendants conspired to possess with intent to distribute and did distribute narcotics, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 860.[1]

### B.   **Joint Trial and Appeal (2008)**

Over the course of twelve days from February 11 to 27, 2008, Appellants were tried jointly.  Appellants, witnesses, and the government referred to the drug trafficking organization of which Appellants were accused of being members as "Las Avispas" (in English, "The Wasps").  The original Las Avispas, Las Avispas Uno, operated in the Borinquen Ward of Guayama, Puerto Rico.  After approximately forty-three members of Las Avispas Uno were arrested in 2002, the organization reconstituted itself in 2003 as Las

---

[1]  Count Two, relating to forfeiture of property upon a conviction under Count One, 21 U.S.C. § 853(a)(1) and (2), was dismissed at each Appellant's sentencing hearing.

-4-

Avispas Dos, also in the Borinquen Ward. Las Avispas Dos managed a drug distribution point, Las Vías, approximately 752 feet from the Luis Muñoz Elementary School ("the School"), which was operational at the time. Multiple witnesses testified at trial that Las Avispas Dos also operated a second drug distribution point, La Pluma.

At trial, the government presented evidence that Appellants were each active members, if not leaders, of Las Avispas Dos, which conspired to distribute heroin, cocaine, cocaine base (also known as crack cocaine), and marijuana. Evidence presented at trial also indicated that members of Las Avispas Dos, including some Appellants, (1) possessed firearms to ward off rival drug trafficking organizations and to maintain control over their drug distribution points and (2) killed and attempted to kill individuals to further intimidate and exert control. Among other things, the government specifically alleged that Rivera-Rodríguez and Muñiz-Massa, along with two indicted co-conspirators not appellants in this case, killed Ricardo Haddock-Collazo ("Haddock-Collazo"), on or about September 12, 2004, "since they believed he was providing information about the drug distribution organization to law enforcement authorities."

On the final day of the trial, the jury found each Appellant guilty as to Count One of the indictment. Furthermore, the jury unanimously agreed to the following findings, by proof

beyond a reasonable doubt: (1) all Appellants conspired to possess with the intent to distribute fifty grams or more of a mixture or substance containing cocaine base (crack); (2) Muñiz-Massa, Pabón-Mandrell, and Rivera-Moreno conspired to possess with the intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin; (3) Arzola-Martínez and Rivera-Rodríguez conspired to possess with the intent to distribute less than one hundred grams of a mixture or substance containing a detectable amount of heroin; (4) all Appellants conspired to possess with the intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine; (5) Muñiz-Massa, Pabón-Mandrell, Rivera-Moreno, and Rivera-Rodríguez conspired to possess with the intent to distribute one hundred kilograms or more of a mixture or substance containing a detectable amount of marijuana; (6) Arzola-Martínez conspired to possess with the intent to distribute less than one hundred kilograms of a mixture or substance containing a detectable amount of marijuana; and (7) all Appellants were involved in conspiracy and drug distribution activities that took place within 1,000 feet of a public and/or private school.

Appellants were sentenced between May and July of 2008. On May 20, the district court sentenced Rivera-Rodríguez to a term of imprisonment of forty-three years followed by a term of supervised release of fifteen years. On May 30, the district court

sentenced Muñiz-Massa to a term of imprisonment of sixty years followed by a term of supervised release of fifteen years. On June 6, the district court sentenced Pabón-Mandrell to a term of imprisonment for the remainder of his natural life followed by a term of supervised release of ten years. On June 25, the district court sentenced Rivera-Moreno to a term of imprisonment of thirty-five years followed by a term of supervised release of fifteen years. Finally, on July 28, the district court sentenced Arzola-Martínez to a term of imprisonment for the remainder of his natural life followed by a term of supervised release of fifteen years.[2]

Between May and August of 2008, each Appellant filed his timely notice of appeal. Each Appellant raises multiple issues on appeal.[3] First, we address challenges by Arzola-Martínez, Muñiz-

---

[2] In the companion cases of <u>United States</u> v. <u>Cintrón-Echautegui</u>, 604 F.3d 1 (1st Cir. 2010), and <u>United States</u> v. <u>Rivera-Moreno</u>, No. 08-1961, 2010 U.S. App. LEXIS 14677 (1st Cir. July 19, 2010), two co-conspirators in Las Avispas Dos pled guilty to the conspiracy count, and we affirmed the district court's judgments in each case.

[3] Besides the issues discussed here, Arzola-Martínez, Pabón-Mandrell, and Rivera-Rodríguez raised, in their initial brief, another issue, concerning the number of peremptory challenges the district court granted to the prosecution at trial. These Appellants argued that the district court committed plain error when it granted the prosecution twelve peremptory challenges, which these Appellants argued violated Federal Rule of Criminal Procedure 24(b)(2). These Appellants thus requested that we find that the district court committed plain error and grant them a new trial. In supplemental appellate briefing that we ordered both parties to submit after oral argument, the government noted that, during a supplemental conference with the district court on March 12, 2010, "[t]he district court and the trial attorneys (both for the government and defense) clarified that although the record says '12' only six (6) peremptory challenges were given to the

Massa, and Rivera-Moreno to the district court's evidentiary rulings. Second, we consider the argument made by these three Appellants that the evidence presented at trial was insufficient for a jury to find them guilty beyond a reasonable doubt. We then consider, under plain error review, whether the ex parte conversations that the district judge held with prospective jurors violated Appellants' Sixth Amendment rights. Finally, we evaluate various issues raised concerning the sentencing of Arzola-Martínez, Rivera-Rodríguez, and Pabón-Mandrell.

## II. Discussion

## A. Evidentiary Rulings

On appeal, Arzola-Martínez, Muñiz-Massa, and Rivera-Moreno claim that the district court made several erroneous evidentiary rulings at trial. We disagree. We conclude that the district court did not abuse its discretion in making the evidentiary rulings at issue.

### 1. Standard / Scope of Review

We review a district court's evidentiary rulings and Brady determinations for abuse of discretion. United States v. DeCologero, 530 F.3d 36, 65 (1st Cir. 2008); United States v. Walter, 434 F.3d 30, 33 (1st Cir. 2006). We review de novo "whether the strictures of the Confrontation Clause have been met."

government with two challenges for the 3 alternates." Appellants conceded the point during that conference, and so we do not address this issue further.

-8-

<u>Walter</u>, 434 F.3d at 33 (quoting <u>United States</u> v. <u>Vega Molina</u>, 407 F.3d 511, 522 (1st Cir. 2005))(internal quotation marks omitted). "Only rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." <u>Freeman</u> v. <u>Package Mach. Co.</u>, 865 F.2d 1331, 1340 (1st Cir. 1988).

### 2. Analysis

#### a. Arzola-Martínez

Arzola-Martínez claims that the district court erred when it allowed the prosecution to present, as evidence of his membership in the conspiracy, a firearm and narcotics the police seized during separate arrests that he argues were unconnected to, even if they were contemporaneous with, the charged conspiracy. Arzola-Martínez argues that no evidence linked these events to the charged conspiracy, so admission of these events was improper character evidence under Rule 404(b) and prejudicial under Rule 403.

Víctor Javier Veguilla-Figueroa ("Officer Veguilla-Figueroa"), a member of the Puerto Rico Police Department ("PRPD"), testified that, around 9:00 p.m. on October 13, 2005, a date which fell within the time frame of the charged conspiracy, he and two other PRPD police officers performing surveillance in Guayama received a communication over their radio that three individuals in

-9-

a particular vehicle were armed and had threatened someone. Officer Veguilla-Figueroa stated that he and his colleagues identified and pursued the car, which initially refused to stop. When the vehicle finally did stop, Officer Veguilla-Figueroa placed the driver, Arzola-Martínez, under arrest and searched him, seizing a firearm.

José A. Ortiz-Reyes ("Officer Ortiz-Reyes"), another PRPD member, testified that, around 2:20 p.m. on April 24, 2006, he and a fellow PRPD police officer performing preventive patrolling in Guayama observed a particular vehicle almost negligently collide with a second vehicle. Officer Ortiz-Reyes indicated to the driver of the first vehicle that he should stop. Instead, the vehicle fled, and Officer Ortiz-Reyes chased it. After the vehicle finally did stop, Officer Ortiz-Reyes approached it and observed on the back floor rug behind the seat of the passenger, whom Officer Ortiz-Reyes identified as Arzola-Martínez, a plastic ziplock bag containing plastic vials filled with powder that later tested positive for cocaine. The police then arrested Arzola-Martínez and the vehicle's driver.

The police retrieved the gun from Arzola-Martínez, who possessed the weapon during the time and in the vicinity of the drug conspiracy. The police retrieved the narcotics from a car in which Arzola-Martínez was a passenger during the time and in the vicinity of the drug conspiracy. We have previously found that the

-10-

presence of firearms and narcotics is probative of an intent to distribute narcotics. See United States v. Rivera-Calderón, 578 F.3d 78, 94 (1st Cir. 2009) (holding that a gun retrieved by police from a defendant who possessed the gun during the time and in the vicinity of a drug conspiracy "clearly was relevant evidence" and made it more probable that the defendant was a member of this particular conspiracy because, "in drug trafficking[,] firearms have become 'tools of the trade' and thus are probative of the existence of a drug conspiracy." (citation and internal quotation marks omitted)); see also United States v. Cannon, 589 F.3d 514, 518-19 (1st Cir. 2010). Because the events to which Officer Veguilla-Figueroa and Officer Ortiz-Reyes testified occurred at the time and in the vicinity of the conspiracy, and also because the evidence confiscated included "tools of the trade" used in the conspiracy, the district court did not abuse its discretion in admitting the testimonies of Officer Veguilla-Figueroa and Officer Ortiz-Reyes as relevant to Arzola-Martínez's role in the conspiracy.

### b. Muñiz-Massa

As we discuss below, the district court did not abuse its discretion in making its rulings related to the first three of four evidentiary rulings Muñiz-Massa claims were erroneous, and we need not reach the fourth.

First, Muñiz-Massa claims that the district court erred when it prevented him from fully cross-examining the criminal histories of Carlos Brito-Pacheco ("Brito-Pacheco") and José Rivera-Díaz ("Rivera-Díaz"), the government's two cooperating witnesses, for the purpose of impeaching them as witnesses against him. Muñiz-Massa argues that the district court's evidentiary ruling that prevented the defense from effectively cross-examining the government's two main witnesses as to their prior convictions and arrests unfairly infringed Muñiz-Massa's Confrontation Clause right under the Sixth Amendment.

We have previously noted that

> the right to cross-examination is not unbridled. So long as the trial court affords the defendant a fair opportunity for effective cross-examination, it may impose reasonable restrictions based on concerns such as undue prejudice, confusion of the issues, witness badgering, redundancy, or questioning that appears to be of marginal relevance. The trial court's latitude in shaping such restrictions is "wide."

United States v. Molina, 407 F.3d 511, 523 (1st Cir. 2005) (internal citation omitted). Specifically, as relevant to Muñiz-Massa's claim, we have observed that district courts may exercise discretion in restricting a defendant's impeachment of a witness against him by limiting cross-examination of that witness's prior conduct. See United States v. Bunchan, 580 F.3d 66, 71 (1st Cir. 2009)(finding no abuse of discretion in the district court's restriction of appellant's cross-examination regarding criminal

charges pending against a witness where the district court found reference to the nature of the charged crime too prejudicial under Federal Rule of Evidence 403); see also Fed. R. Evid. 403; Fed. R. Evid. 608.

At one point during cross-examination, defense counsel sought to show that Brito-Pacheco was in prison in 2004 and so could not have had first-hand knowledge of events concerning Las Avispas Dos during a portion of the time to which he testified. In front of the jury, defense counsel asked Brito-Pacheco if it was true that, after his release from prison on June 16, 2003, he was "sent back to jail because [he] did not comply with the conditions [of his probation], right?" On the government's objection that defense counsel's suggestion was not in good faith (because the government claimed the defense counsel knew that Brito-Pacheco was not, in fact, sent back to jail for violating the conditions of his probation) and would leave the jury with an incorrect impression about when Brito-Pacheco was incarcerated, the district court determined that Brito-Pacheco was, in fact, imprisoned from September 2002 to June 2003 and again from September 2005 through and including his testimony at trial in February 2008, and so was "out on the streets" in 2004.[4] After this review of Brito-Pacheco's criminal history, the defense counsel acknowledged

---

[4] The record is not clear about the nature of these two arrests and convictions. We can only glean that they were related to weapons charges.

"[t]hat clears it up Your Honor" and that he had "no problem with that." At a later point during cross-examination, defense counsel, Brito-Pacheco, the district court, and the government engaged in the following dialogue:

> [Defense counsel]: I would like to get a chronology of your arrests, convictions, revocations. You were first arrested back in the year 2000 what?
>
> [Brito-Pacheco]: 2002
>
> [Defense counsel]: Was that a drug charge?
>
> [The government]: Objection, and we object as to the line of questioning being asked and answered as to the specific - -
>
> [The court]: The objection goes as to the nature of the charges. There has been testimony as to the arrests and sentences.

While Muñiz-Massa claims in his appellate brief that, at this point, the trial court "prevented defense counsel from cross-examining the nature of the prior criminal charges presented against Brito-Pacheco," it is clear from the record that the trial court made no ruling either way on the government's objection and defense counsel did not seek to clarify or otherwise pursue the matter at trial. Instead, the district court permitted defense counsel, uninterrupted, to establish for the jury the dates during which Brito-Pacheco was incarcerated in order to make the point, in front of the jury, that Brito-Pacheco had "no personal knowledge of anything that occurred in this case after September of 2005." We

-14-

thus find that the district court allowed Muñiz-Massa "a fair opportunity for effective cross-examination" of Brito-Pacheco.

With respect to Rivera-Díaz, defense counsel attempted to question the witness about whether he qualified for a reduction in the range of his sentencing for a previous arrest.[5] Rivera-Díaz responded during the cross-examination that he did not qualify for the sentence reduction. The defense counsel then sought to admit Rivera-Díaz's plea agreement about the prior arrest as an exhibit and to ask Rivera-Díaz why he did not qualify for the sentence reduction. On the government's objection that the prior conviction did not entail truthfulness or dishonesty, the district court stated that it would not permit defense counsel's further questioning on the matter. The district court stated that the defense counsel's line of questioning was not in good faith because the attorney already knew that Rivera-Díaz did not qualify for the sentence reduction, and the exhibit could only mislead the jury into thinking otherwise.

In another instance, defense counsel asked Rivera-Díaz to explain the criminal history category listed on his plea agreement. Rivera-Díaz responded that he could not explain the concept. On the government's objection to defense counsel continuing the line of questioning, the district court asked defense counsel to explain

_____

[5]  The record is not clear about the nature of this arrest. Defense counsel stated that it was for larceny but noted that Rivera-Díaz said it was drug-related.

-15-

where the questioning was leading. Defense counsel responded that he intended to elicit from Rivera-Díaz that the criminal history category is based on the record of conviction and then to ask the witness about his prior conviction and government cooperation. The district court precluded the line of questioning because it concluded that the questioning was not to be used to explain the legal principles involved in various criminal history categories, as defense counsel claimed, but rather to introduce, indirectly, the witness's prior criminal convictions that were otherwise inadmissible. In sum, the district court, through the application of Federal Rule of Evidence 608(b) and the balancing required by Federal Rule of Evidence 403, determined that cross-examination of the prior criminal conduct of Rivera-Díaz in these two instances was prohibited.

As in Bunchan, see id. at 71, and as Muñiz-Massa acknowledges, the district judge did permit other cross-examination of each witness. Both witnesses were cross-examined on their drug sales and usage, and Brito-Pacheco was also cross-examined on the fact of his imprisonment from 2002 to 2003 and from 2005 until his testimony at trial and on his cooperation with the government in 2006. Any restriction of Muñiz-Massa's Confrontation rights was thus reasonable.

Second, Muñiz-Massa contends that the district court erred when it allowed the government to present witness testimony

through the use of leading questions. Muñiz-Massa argues that, at one point during cross-examination, Rivera-Díaz listed the members of Las Avispas but did not mention Muñiz-Massa, saying, after naming fourteen members, that he did not "recall anybody else[] right off the top of my head." Muñiz-Massa argues that the prosecutor then, on redirect examination, had to lead the witness to elicit a response that included Muñiz-Massa in the membership of Las Avispas Dos. The prosecutor asked Rivera-Díaz "what were the different roles of the members of Las Avispas, that you see here today?" The district court overruled defense counsel's objection that the question went beyond his cross-examination, stating that, although defense counsel had not specifically inquired about the roles of Las Avispas Dos members, because Rivera-Díaz provided a description of roles in cross-examination from other attorneys, the district judge would allow the testimony. After the prosecutor asked "out of the members of Las Avispas that are present here in court, what are their different roles?," Rivera-Díaz then identified Muñiz-Massa as a "pusher," or "seller," at Las Vías.

In another instance, when the government asked Rivera-Díaz to "identify which members of Las Avispas actually carried firearms with them," Rivera-Díaz did not include Muñiz-Massa in the list. The government then asked Rivera-Díaz: "Are you aware of any of the members of Las Avispas that you have identified here in court today, that used to carry firearms?" Defense counsel

objected, stating that the prosecution "is trying to jiggle the witness recollection." The district court overruled the objection, stating "[t]he government may refresh his recollection, with a document or statements or asking him to look around . . . . [T]his morning we had to take a break because [Rivera-Díaz] had not eaten. So the government is entitled to probe, and refresh other things for this witness." The government then asked Rivera-Díaz: "[L]ooking around in the courtroom and out of the members of Las Avispas that you have identified that are present here in court, are you aware if any of them used to carry firearms?" Rivera-Díaz then identified, among others, Muñiz-Massa.

We have found that any error in the prosecution's use of leading questions is harmless where there is no evidence that the leading questions prompted inaccurate testimony. See United States v. De León-Quiñones, 588 F.3d 748, 756-57 (1st Cir. 2009). Here, the district court explained that it would permit the questions over defense counsel's objections because they were designed to elicit further information to which the witness previously testified and also because they were used to refresh recollection. Two days before both of the incidents described above, Rivera-Díaz had identified Muñiz-Massa as a "seller" for Las Avispas Dos who "always had the pistol on him and he was always hanging out with [Rivera-Rodríguez]." That testimony is consistent with Rivera-Díaz's testimony, in response to leading questions, two days later

-18-

about Muñiz-Massa's membership in Las Avispas Dos and gun possession. We thus conclude that any error in allowing these leading questions was harmless and that there is no evidence that they prompted inaccurate testimony.

Third, Muñiz-Massa argues that the district court erred when it admitted the testimony of Brito-Pacheco, a cooperating witness, about Muñiz-Massa's alleged admission that he participated in Haddock-Collazo's murder. Specifically, Muñiz-Massa claims that the government failed to disclose his inculpatory admission to the defense before the government presented Brito-Pacheco's testimony at trial. Muñiz-Massa argues that this disclosure was required pursuant to Bruton v. United States, 391 U.S. 123 (1968), and its progeny, which held that "a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." Richardson v. Marsh, 481 U.S. 200, 207 (1987)(citing Bruton, 391 U.S. at 135-36). However, although Muñiz-Massa objected at trial to Brito-Pacheco's testimony about Muñiz-Massa's admission on hearsay grounds, Muñiz-Massa did not object on Bruton grounds. Muñiz-Massa thus waived any objection to this matter by not raising it at trial. See Campos-Orrego v. Rivera, 175 F.3d 89, 95 (1st Cir. 1999) ("We have reiterated, with a regularity bordering on the echolalic, that a

-19-

party's failure to advance an issue in the nisi prius court ordinarily bars consideration of that issue on appellate review."). Furthermore, even if Muñiz-Massa had raised this matter at trial, Bruton is inapplicable because the statement in question was his own, not that of a codefendant. The district court thus did not err in admitting Brito-Pacheco's testimony about Muñiz-Massa's alleged admission.

Finally, Muñiz-Massa contends that the district court erred when it admitted photographic evidence of Haddock-Collazo's murdered body. Rule 403 gives trial courts broad discretion to reject evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403; see also United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2003). In a prosecution alleging that the defendants participated in a murder, the district court may conclude that photographic evidence of the murder helps the jury understand the nature and severity of the charged conduct and is not unfairly prejudicial. See United States v. Cartano, 420 F.2d 362, 364-65 (1st Cir. 1970); see also, e.g., United States v. Greatwalker, 356 F.3d 908, 912-13 (8th Cir. 2004). Even if the district court abused its discretion here, which we seriously doubt, any purported error was harmless in light of the other overwhelming evidence against Muñiz-Massa. See United States v. Hicks, 575 F.3d 130, 143 (1st Cir. 2009) ("We review non-constitutional evidentiary errors for harmlessness; an error is

harmless if it is 'highly probable that the error did not influence the verdict.'" (citation omitted)).

### c. Rivera-Moreno

Rivera-Moreno claims that the government violated his rights protected by Brady v. Maryland, 373 U.S. 83 (1963), when it failed to disclose the allegedly exculpatory testimony Rivera-Díaz provided during sentencing, which Rivera-Moreno claims contradicted testimony Rivera-Díaz provided during trial. Rivera-Moreno's claim concerns testimony Rivera-Díaz provided in an interview with a probation officer during the preparation of Rivera-Moreno's Presentence Investigation Report ("PSR").

Rivera-Moreno concedes that "[t]he government's obligations under Brady only extend to information in its possession, custody, or control." United States v. Hall, 434 F.3d 42, 55 (1st Cir. 2006). Nevertheless, Rivera-Moreno contends that the government had a duty to learn and disclose the details of Rivera-Díaz's sentencing-related testimony. That, however, is not the law. "While a prosecutor must disclose information maintained by government agents even if the prosecutor herself does not possess the information, this duty does not extend to information possessed by government agents not working with the prosecution." Id. (internal citations omitted). Rivera-Díaz's sentencing-related testimony was maintained by the probation officer preparing the PSR, and there is no evidence that the federal prosecutor or any

-21-

agent working on the U.S. Attorney's behalf had this information prior to or during trial. Accordingly, the government committed no Brady violation.

## B. Sufficiency of the Evidence

At the close of the government's case-in-chief, Arzola-Martínez, Muñiz-Massa, and Rivera-Moreno each filed a timely motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) ("Rule 29 motion"). The district court denied each of these motions and proceeded with closing arguments before submitting the case to the jury. On appeal, these three Appellants, although not challenging whether a drug conspiracy existed, claim that the evidence presented at trial was insufficient for a jury to find them guilty of participating in it.[6] These three Appellants thus request that we reverse their convictions and remand their cases to the district court for a new trial. We decline to do so. In this section, we consider whether the evidence discussed in the previous section, along with other evidence, could have led a reasonable jury to find each of these three Appellants guilty beyond a reasonable doubt of the conspiracy charged. We conclude that a

---

[6] Arzola-Martínez and Muñiz-Massa also attack the credibility of witnesses who testified at trial as a basis for finding that the evidence was insufficient for a jury to find them guilty. However, "[w]e do not assess the credibility of a witness, as that is a role reserved for the jury." United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009) (citation and internal quotation marks omitted). We thus need not consider this matter.

reasonable jury could find Appellants guilty beyond a reasonable doubt.

## 1. Standard / Scope of Review

We review the denial of a Rule 29 motion for judgment of acquittal de novo. Troy, 583 F.3d at 24. In so doing,

> we examine the evidence, both direct and circumstantial, in the light most favorable to the jury's verdict. We do not assess the credibility of a witness, as that is a role reserved for the jury. Nor need we be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence. Rather, we must decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime.

Id. (internal citations and quotation marks omitted).

"We have described this standard of review as 'formidable,' and defendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008) (internal citation, quotation marks, and brackets omitted). We have repeatedly emphasized, however, that, "despite the prosecution-friendly overtones of the standard of review, appellate oversight of sufficiency challenges is not an empty ritual." United States v. De La Cruz-Paulino, 61 F.3d 986, 999 n.11 (1st Cir. 1995) (citation and quotation marks omitted).

## 2. Legal Framework

Appellants were charged with participating in a conspiracy to distribute drugs. We have previously found that,

> [t]o establish that a conspiracy existed, the government had to prove beyond a reasonable doubt that each defendant knowingly and voluntarily agreed with others to commit a particular crime. Such an agreement may be express or tacit, that is, represented by words or actions, and may be proved by direct or circumstantial evidence.

Rivera-Calderón, 578 F.3d at 88-89 (citations omitted); United States v. Famania-Roche, 537 F.3d 71, 78 (1st Cir. 2008). "To establish that the defendants belonged to and participated in the drug conspiracy, the government must show two kinds of intent: intent to agree and intent to commit the substantive offense." United States v. Bristol-Mártir, 570 F.3d 29, 39 (1st Cir. 2009) (citation and internal quotation marks omitted). We have also previously observed that "[u]nder established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy." United States v. Hurley, 63 F.3d 1, 22 (1st Cir. 1995) (citing Pinkerton v. United States, 328 U.S. 640 (1946)). However, "the government need not show that the conspirators knew all the details of the conspiracy." United States v. Orrego-Martínez, 575 F.3d 1, 8 (1st Cir. 2009) (citation and internal quotation marks omitted).

-24-

### 3.  Analysis

#### a.  Arzola-Martínez

Arzola-Martínez argues that evidence of what he claims were merely "occasional" sales of "small" amounts of cocaine to Rivera-Rodríguez was insufficient to warrant his conviction as a conspirator of Las Avispas Dos or to establish a violation of 21 U.S.C. § 860.  Arzola-Martínez contends that the prosecution did not establish that he had a stake in the success of the retail sales made by the drug organization at the housing project or in its profits.  Furthermore, Arzola-Martínez argues that, because there was no evidence that Arzola-Martínez sold cocaine to Rivera-Rodríguez near the School, the evidence was insufficient to convict him under 21 U.S.C. § 860.

Arzola-Martínez's arguments miss the mark.  We find that sufficient evidence was presented at trial for a rational jury to conclude beyond a reasonable doubt that Arzola-Martínez was a conspirator of Las Avispas Dos and to establish his violation of 21 U.S.C. § 860.  First, a former member of both Las Avispas Uno and Dos, Brito-Pacheco, testified that Arzola-Martínez was a member of Las Avispas Dos with whom he would "sell drugs" and "shoot" people.  Brito-Pacheco further testified that Arzola-Martínez "quite frequently" sold cocaine in the Borinquen Ward to Rivera-Rodríguez in order for Rivera-Rodríguez to manufacture crack because the crack "sells alot [sic] and makes alot [sic] of money."

-25-

Second, as discussed above, Officer Veguilla-Figueroa testified that when he arrested Arzola-Martínez in 2005, Officer Veguilla-Figueroa seized a firearm from him. Third, also as discussed above, Officer Ortiz-Reyes testified that in 2006 Arzola-Martínez was a passenger in a car in which the police found plastic vials of a substance later shown to contain cocaine. A search of the vehicle conducted in the presence of both Arzola-Martínez and the driver also uncovered in the front glove compartment $468 in cash, which Arzola-Martínez told Officer Ortiz-Reyes belonged to him.

We find that this direct and circumstantial evidence was sufficient to convict Arzola-Martínez of Count One. The testimony of these three witnesses about Arzola-Martínez's role, relationships, and activities in Las Avispas Dos was sufficient for a reasonable jury to conclude that Arzola-Martínez knowingly and voluntarily agreed with others to participate in Las Avispas Dos's drug-related activities. A reasonable jury could conclude from Brito-Pacheco's testimony that Arzola-Martínez was a member of Las Avispas Dos who engaged in drug dealing, shooting people, and supplying cocaine to Rivera-Rodríguez. A reasonable jury could infer from the testimony of Officer Veguilla-Figueroa and Officer Ortiz-Reyes that the firearm, cocaine, and cash they found on or with Arzola-Martínez were related to his participation in Las Avispas Dos. Not only, as discussed above, have we previously

-26-

found the presence of drugs and guns to be probative of an intent to distribute narcotics, but we have also found lesser sums than that with which Arzola-Martínez was found to be "substantial amounts [of cash]" that, when discovered near narcotics in a vehicle, "support the inference that the car's occupants were engaged in the sale, rather than casual use, of drugs." Cannon, 589 F.3d at 518.

In order to convict Arzola-Martínez of the charged conspiracy, the government need not have established that Arzola-Martínez sold cocaine at a particular frequency or of a certain amount, or that he had a personal stake in the success of Las Avispas Dos's sales or profits. Rather, the government only had to prove that he was a member of the conspiracy and that the sales and profits were reasonably foreseeable to him. As discussed above, the government met that burden.

The government, moreover, need not have established that Arzola-Martínez himself sold cocaine near the School, again so long as the government proved he was a member of the conspiracy and the location of those sales was reasonably foreseeable to him. According to a former member of Las Avispas Uno and Dos, Rivera-Díaz, Las Avispas Dos members would prepare crack in a house adjacent to the School. As discussed above, Las Vías, a drug distribution point Las Avispas Dos managed, was located approximately 752 feet from the School.

### b. Muñiz-Massa

Muñiz-Massa claims that the evidence was "insufficient to show [his] knowledge and/or participation in" the conspiracy. In particular, Muñiz-Massa alleges that "it was never clear on the record whether he was associated and part of the 'Las V[í]as' or 'La Pluma' drug organization or both."

At trial, cooperating witness Brito-Pacheco testified that, like Arzola-Martínez, Muñiz-Massa was a member of Las Avispas Dos with whom he would "sell drugs" and "shoot" people. Brito-Pacheco specified that Muñiz-Massa sold drugs and was a "runner"[7] for Las Avispas Dos. Brito-Pacheco further testified that Muñiz-Massa was his partner in selling drugs in order to "keep an eye on each other and to make money [for] both of us." Brito-Pacheco also stated that Muñiz-Massa told him that, in September 2004 and in furtherance of the charged conspiracy, Muñiz-Massa, along with Rivera-Rodríguez and three others, killed Haddock-Collazo, whom they suspected of cooperating with law enforcement's investigation of Las Avispas Dos. Brito-Pacheco helped dispose of the body. In his testimony at trial, Charles Alvarado-Dávila, a member of the PRPD, corroborated Brito-Pacheco's description of the date on which, and the location where, Haddock-Collazo's body was found,

---

[7] Rivera-Díaz testified that a runner "is in charge of keeping the material in his house to then bring it over to the drug point and hand it over to the seller, and then to collect the monies and keep it for the owner of the material."

-28-

its condition, and, also consistent with Brito-Pacheco's testimony, that the body had been moved between two locations. At trial, a forensic pathologist testified that, through an autopsy she performed on his body, she determined Haddock-Collazo's cause of death to be from "severe head trauma." This testimony was consistent with the description of the murder about which Brito-Pacheco testified that Muñiz-Massa had told him.

Rivera-Díaz testified that, during the course of and related to the charged conspiracy, he saw Muñiz-Massa carry firearms. Rivera-Díaz stated that Muñiz-Massa "would sell for [Las Avispas Dos] . . . . He always had the pistol on him and he was always hanging out with [Rivera-Rodríguez]."

We find that this evidence was sufficient to convict Muñiz-Massa. The testimony of these four witnesses about Muñiz-Massa's role, relationships, and activities in Las Avispas Dos was sufficient for a reasonable jury to conclude that Muñiz-Massa knowingly and voluntarily agreed with others to participate in Las Avispas Dos's drug-related activities, engaged in drug dealing and, in furtherance of the conspiracy, violently confronted other people whom Muñiz-Massa perceived as a threat to the organization.

As discussed above, multiple witnesses testified at trial that the single Las Avispas Dos organization operated two drug distribution points, called Las Vías and La Pluma. Las Avispas Dos -- and not Las Vías and La Pluma -- was the organization of which

Muñiz-Massa and others were charged with being members. The jury could have reasonably concluded that Las Vías and La Pluma, both areas in the Borinquen Ward of Guayama, were merely locations of Las Avispas Dos's operations. The government need only to have proven beyond a reasonable doubt that Muñiz-Massa was involved in Las Avispas Dos, irrespective of his involvement in a particular drug distribution point, and it did just that.

### c. Rivera-Moreno

Rivera-Moreno claims that the record lacked "any evidence or a reliable inference from any evidence to establish any intent or partial intent to enter into an agreement" sufficient to convict him of the charged conspiracy. We find otherwise.

According to Rivera-Díaz's testimony at trial, in 2003, he and other former members of Las Avispas Uno, including Rivera-Moreno (Rivera-Díaz's brother-in-law), met to discuss the establishment, management, and operation of Las Avispas Dos. Rivera-Díaz testified that, because Rivera-Moreno "was the runner for the owner of [Las Avispas Uno] . . . and he knew who to buy the drugs or heroin from," the group decided that Rivera-Moreno would "stay in charge" of Las Avispas Dos, which meant he would "be the owner of the [drug distribution] point." Rivera-Díaz also testified that Rivera-Moreno would obtain heroin from a contact and then pass it along to other members of Las Avispas Dos who served as runners and distributors. Rivera-Díaz further testified to

Rivera-Moreno's leadership role in Las Avispas Dos when the former stated that the latter "ordered" Las Avispas Dos members "not to sell on Holy Friday" and that the runner of heroin for Las Avispas Dos would give to Rivera-Moreno $9.00 of the $10.00 cost of each of 800 to 900 packages of heroin sold during each of three shifts per day.

A second cooperating witness, Brito-Pacheco, corroborated Rivera-Díaz's testimony about Rivera-Moreno's participation in Las Avispas Dos, including Rivera-Moreno's role as the organization's heroin supplier. As he had done with Arzola-Martínez and Muñiz-Massa, Brito-Pacheco testified that he would "sell drugs" and "shoot" people with Rivera-Moreno.

A third witness, César Alicea-Léon ("Alicea-Léon"), testified that, between 2003 and 2006, he distributed "large amounts" of heroin to Rivera-Moreno, whom Alicea-Léon stated "was in charge" of the drug distribution point in the Borinquen Ward.

A fourth witness, Roberto Ayala-Vega ("Officer Ayala-Vega"), who worked in the PRPD's Tactical Division from 2005 to 2007, testified that on or about November 4, 2006 he was patrolling the Borinquen Ward when Rivera-Moreno and another person "became aware of [his] patrol car . . . . They started running off and they dropped controlled substances . . . ." Field tests later revealed that the substances contained cocaine and heroin, which a trained and licensed chemist at the Puerto Rico Forensic Science

Institute specializing in controlled substances corroborated in separate testimony. In the vehicle Rivera-Moreno and his associate abandoned, Officer Ayala-Vega found Rivera-Moreno's driver's license, Social Security card, and medical plan card.

Rivera-Moreno argues that this evidence is insufficient because "[t]he United States did not have available at trial any audio, video[,] or photograph depicting [him] doing any illegal act. Much less, we should consider that no firearms, monies, or drugs were either seized or observed in [his] immediate presence." However, as we have previously observed, "[t]he fact that the government did not present certain kinds of evidence does not [necessarily] mean that there was insufficient evidence for conviction." United States v. Liranzo, 385 F.3d 66, 70 (1st Cir. 2004).

We find that the evidence presented was sufficient to convict Rivera-Moreno. The testimony of these four witnesses about Rivera-Moreno's role, relationships, and activities in Las Avispas Dos was sufficient for a jury to conclude beyond a reasonable doubt that Rivera-Moreno knowingly and voluntarily agreed with others to participate in, if not also to lead, Las Avispas Dos's drug-related activities.

In sum, a jury could have found beyond a reasonable doubt that Arzola-Martínez, Muñiz-Massa, and Rivera-Moreno were guilty of participating in the charged conspiracy. We have previously found

similar evidence sufficient to sustain a drug-related conspiracy conviction. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Rodríguez-Lozada</u>, 558 F.3d 29, 39 (explaining that "[t]he evidence is more than sufficient for a rational jury to find" that defendant was part of a drug-trafficking conspiracy where there was evidence of defendant's drug-related relationships and drug-supplying activities).

## C.  **Ex Parte Communications**

A third claim concerns the process by which the district court conducted voir dire at trial.  In their initial appellate briefs, Arzola-Martínez, Pabón-Mandrell, and Rivera-Rodríguez claimed that the district court committed plain error when it conducted individual, ex parte voir dire of prospective jurors, which these Appellants argue violated Federal Rule of Criminal Procedure 43(a)(2).  Through supplemental briefing that we ordered during oral argument, which the parties filed after the district judge held a supplemental hearing on March 12, 2010 ("the supplemental hearing"), the other two Appellants, Muñiz-Massa and Rivera-Moreno, also asserted this claim, arguing that "the method employed [was] the equivalent of depriving [A]ppellants of their Sixth Amendment constitutional right to a public trial and that they be present during all stages of the trial."  Appellants thus request we find that the district court committed plain error by engaging in ex parte communications with prospective jurors and grant Appellants a new trial.  The government responds that any ex

-33-

parte conversations between the judge and jurors were not structural error and harmless beyond a reasonable doubt, and, in any case, Appellants waived any objection to them by not raising the matter at trial. As discussed below, we find that the ex parte conversations that the district judge held with prospective jurors should be reviewed under -- and fail to satisfy -- the plain error standard.

### 1. Standard / Scope of Review

Neither Appellants nor the government objected to the ex parte communications described below at trial. The Supreme Court recently clarified the standard of review an appellate court must apply when considering a claim not raised at trial. See United States v. Marcus, 130 S. Ct. 2159, 2164 (2010). The Supreme Court observed that "[Federal] Rule [of Criminal Procedure] 52(b) permits an appellate court to recognize a 'plain error that affects substantial rights,' even if the claim of error was 'not brought' to the district court's 'attention.'" Id.; see also Fed. R. Crim. P. 52(b). The Court held:

> an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

<u>Marcus</u>, 130 S. Ct. at 2164 (alteration in original)(citations and internal quotation marks omitted).

As discussed below, we assume arguendo that Appellants' claim satisfies the first and second prong of the Supreme Court's articulation of the plain error standard. However, because we do not find that Appellants' claim satisfies the third prong, we need not resolve the fourth prong, and Appellants' claim fails. Before engaging in our plain error review, we summarize the ex parte communications and the district court's rationale for them.

### 2. The Ex Parte Communications

Appellants claim, and the government does not refute, that the district court conducted ex parte examinations of fifteen prospective jurors -- Juror Nos. 1, 2, 3, 10, 13, 21, 23, 35, 40,[8] 41, 47, 58, 60, 64, and 66 -- out of a total of seventy-one prospective jurors.[9],[10] In other words, 21 percent of the

---

[8] An inconsistency exists in the record with respect to Juror No. 40. At one point during voir dire on February 11, 2008, Juror No. 40 is recorded as referring to "my wife," whereas at another point on the same day the juror is recorded as referring to "[m]y husband." Furthermore, despite the jury list indicating a female name for Juror No. 40, the district judge, during the supplemental hearing, referred to the prospective juror using the masculine pronoun and mentioned the juror's "wife." The gender of the juror and the juror's spouse are irrelevant to our inquiry, so we need not resolve these matters.

[9] We derive the total number of prospective jurors from the district judge's list provided in Appellants' supplemental brief.

[10] In the cases of Juror Nos. 2 and 35, the trial transcript does not explicitly state that the conversations occurred "[a]t the bench," as the trial transcripts of the other ex parte

prospective jurors were examined ex parte by the district court. Six of those prospective jurors -- Juror Nos. 1, 2, 10, 23, 35, and 40 -- were not excused by the district judge and thus were candidates for peremptory strike challenges. Four of those unexcused prospective jurors -- Juror Nos. 10, 23, 35, and 40 -- were struck by the defendants (the government did not strike any of them), leaving two of those prospective jurors -- Juror Nos. 1 and 2 -- on the panel. As a result, 16.7 percent of the empaneled jurors were subjected to ex parte communications by the court during the voir dire process.

The district judge employed various methods for memorializing these ex parte communications. For ex parte

communications do.

In the case of Juror No. 2, the district judge summarized the conversation when she summarized the ex parte communications she conducted with other prospective jurors, suggesting that the judge's communication with this juror was also ex parte. During the supplemental hearing, the district judge resolved this matter by acknowledging that the prospective juror "was examined at the bench."

In the case of Juror No. 35, the trial transcript reflects that that prospective juror stated his number and then that the district judge summarized what the prospective juror said. This portion of the transcript thus suggests that the district judge did conduct an unrecorded ex parte communication with this prospective juror.

Given that (1) the district judge summarized the conversations she had with both Juror Nos. 2 and 35, as she did with the other thirteen prospective jurors with whom she conducted ex parte communications, (2) Appellants claim and the government does not refute that Juror Nos. 2 and 35 were subject to ex parte communications, and (3) the district judge concedes that at least the communication with Juror No. 2 was ex parte, we assume that both of these jurors were indeed among the prospective jurors questioned by the district judge outside the presence of counsel.

communications with nine of the fifteen prospective jurors (Juror Nos. 1, 2, 3, 10, 13, 21, 23, 40, and 47), the court reporter was present and the trial transcript thus reflects the conversations between the district judge and the prospective jurors. For ex parte communications with six of the prospective jurors (Juror Nos. 35, 41, 58, 60,[11] 64, and 66), the court reporter was not present and the trial transcript thus does not reflect the conversations between the district judge and the prospective jurors, or at least, in one of these cases (Juror No. 60), what the prospective juror said. After each of these six sets of unrecorded ex parte communications, the district judge provided a summary of the conversation, as reflected in the trial transcript.

In the course of conducting these ex parte communications with prospective jurors, the district judge made at least two mistakes of fact and at least one significant omission when summarizing the prospective jurors' statements to counsel. The two mistakes of fact concerned Juror Nos. 1 and 2, both of whom, as noted above, were ultimately empaneled on the jury. The omission

---

[11] In the case of Juror No. 60, the trial transcript omits what the prospective juror said, noting only that it was in Spanish. The trial transcript does, however, reflect what the district judge stated. Because the transcript of the district judge's statement is within the portion of the transcript noted as being "[a]t the bench," and not "[i]n open court," that suggests that, contrary to Appellants' claim, the court reporter was present and did transcribe the district judge's statement, but omitted the prospective juror's statement. The Spanish answers of Juror No. 60 could have been translated by the court reporter if proper procedure had been followed.

concerned Juror No. 40, who, as noted above, was later removed by a peremptory strike exercised by defense counsel.

During the ex parte communication that the district judge held with Juror No. 1, that juror told the judge that his "son is incarcerated in the state of <u>Florida</u> for a drug related charge" (emphasis added). However, when summarizing the ex parte communication to counsel, the judge stated that this juror's "son had a drug case for which he is incarcerated in the state of <u>Connecticut</u>" (emphasis added). When asked whether either counsel wanted to question this juror, both parties did so briefly about a previous case in which the individual served as a juror. During the supplemental hearing, the district judge acknowledged that the state in which the juror's son was incarcerated "may have been misstated" but noted that "the information that the individual had a son incarcerated for a conviction . . . is correct."

During the ex parte communication that the district judge held with Juror No. 2, the juror told the judge that he "was a witness in court, in a <u>criminal case</u> for the defense" (emphasis added). When asked by the judge if it was "a <u>drug</u> case," the juror responded that "[i]t was a <u>criminal state case</u>" (emphasis added). However, when summarizing the ex parte communication to counsel, the judge stated that this juror "served as a witness in a local court case, he was a witness for the defense and it was a <u>sex offender case</u>. He was a witness for the defense in a <u>criminal sex</u>

offender case" (emphasis added). When asked whether either counsel wanted to question this juror, both parties declined.

During the ex parte communication that the district judge held with Juror No. 40, the juror told the judge: "The brother of my wife has been a drug user for sometime [sic]. He is now in the mental ward, he has never been a [sic] accused or anything like that, but that is the situation." When asked by the judge "[d]oes that affect your impartiality?," the juror responded "[h]opefully not." The record indicates that this information was not conveyed to counsel, either during the judge's summaries of the ex parte communications to counsel or at any other time.

### 3. The District Court's Rationale for the Ex Parte Communications

The district judge explained, before conducting the ex parte communications, that she felt they were necessary "to save time," because, given that the trial involved multiple defendants, "having 12 attorneys moving into and out of the bench [would] be time consuming." The district judge stated at the beginning of voir dire that, after she heard all of the prospective jurors' excuses for not being empaneled, she would "make a judgment call jointly with the attorneys." The district judge also stated that ex parte communications would enable prospective jurors to discuss "personal matters" with the judge that the jurors did not "want to share . . . publicly." It was thus the district court -- not one

-39-

of the parties -- that, sua sponte, initiated ex parte communications.

At the supplemental hearing, the district judge stated multiple times that the communications described above were all "on the record," despite not occurring in the presence of counsel and some not being recorded by the court reporter. She justified her explanation by stating that "notes were taken." The district court further stated that several of the communications are "not an issue" because the "juror was excused for cause" and thus "never became a member of the jury panel."

### 4. Plain Error Review

As the government concedes, ex parte communications between the judge and the jury may raise concerns under Federal Rule of Criminal Procedure 43(a) and the Fifth and Sixth Amendments. See Presley v. Georgia, 130 S. Ct. 721, 724 (2010) (holding that the Sixth Amendment right to a public trial extends to voir dire); United States v. Gagnon, 470 U.S. 522, 528 (1985)(explaining that the Sixth Amendment's Confrontation Clause gives the defendant the right to be present and confront all witnesses and evidence against him and that the Fifth Amendment's Due Process Clause protects the right to be present "in some situations where the defendant is not actually confronting witnesses or evidence against him"); Illinois v. Allen, 397 U.S. 337, 338, 342-43 (1970)(holding that the Sixth Amendment protects

-40-

a defendant's right not to be completely excluded from voir dire); Fed. R. Crim. P. 43(a).

Still, the defendant's right to be present during voir dire is not absolute; it must be balanced against the need to conduct a fair, safe, and orderly trial. See, e.g., Presley, 130 S. Ct. at 724-25 (noting that some circumstances may justify closing voir dire to the public); Gagnon, 470 U.S. at 526-27 (noting that "[t]he defense has no constitutional right to be present at every interaction between a judge and a juror" and holding that the Due Process Clause only protects the accused's right to be present when his presence has a reasonably substantial relationship to the need to defend himself); Allen, 397 U.S. at 342-43 (holding that a defendant, with disruptive behavior, may forfeit his Sixth Amendment right to be present); see also United States v. Collazo-Aponte, 216 F.3d 163, 182 (1st Cir. 2000)(finding no Rule 43 violation when the defendant was "restricted from full participation in a limited number of sidebar conferences that occurred during voir dire").

We assume arguendo that the first and second prongs of plain error review, as articulated in Marcus, are satisfied based on Federal Rule of Criminal Procedure 43(a) and the Fifth and Sixth Amendments. We thus consider the third prong in more detail. The Supreme Court noted that, "[i]n the ordinary case, to meet this [third prong] standard[,] an error must be 'prejudicial,' which

means that there must be a reasonable probability that the error affected the outcome of the trial."  Marcus, 130 S. Ct. at 2164. In further explicating this prong, the Supreme Court noted "the possibility that certain errors, termed 'structural errors,' might 'affect substantial rights' regardless of their actual impact on an appellant's trial."  Id.

We have previously observed that "[t]he [Supreme] Court has classified an error as structural in only a very limited class of cases."  United States v. Fazal-Ur-Raheman-Fazal, 355 F.3d 40, 48 (1st Cir. 2004)(citation and internal quotation marks omitted). Examples of structural errors that the Court has identified include "complete denial of counsel, presence of a biased trial judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and offering a defective reasonable doubt instruction."  Id. (internal citations omitted).  As we do not find that the ex parte communications constituted such "structural error," we assess whether there is "a reasonable probability that the error affected the outcome of the trial."

Very few of these ex parte communications even arguably affected the outcome of the trial.  Of the fifteen ex parte communications, only six were not placed on the record, and of those six, only three jurors' information was incorrectly or incompletely communicated to the parties.  Further, we cannot see

how, had the district judge correctly told the parties that Juror No. 1's son was incarcerated in Florida rather than Connecticut, the parties would have responded differently. That leaves us with only two jurors as the bases for Appellants' claim of substantial prejudice.

We find no reasonable probability that errors as to these jurors affected the trial's outcome. Appellants' argument asks us to make too many assumptions. Juror No. 2 did not answer the district judge's question about what kind of trial he was a witness in. Yet Appellants ask us to assume that, had the district court merely reported that he had been a witness in a criminal trial, counsel would have followed up and successfully learned what kind of trial it was. Counsel explicitly declined to ask any other questions of the witness at the court's invitation. Moreover, we must assume that the juror testified in a drug case, which Appellants have not established. And we must assume that, although he was a witness for the defense, Juror No. 2's participation in this hypothetical drug case so biased him against the defense that he affected the guilty verdict. These guesses do not establish a reasonable probability that Juror No. 2's participation affected the outcome of the trial.

Appellants make an equally attenuated argument regarding Juror No. 40, whose brother-in-law abused drugs. Appellants exercised a peremptory challenge and struck this juror. Thus, to

conclude that the court's mistake probably changed the outcome of the trial, we must assume that Appellants would have moved to strike this juror for cause and that the court would have granted the motion. We further must assume that Appellants would have exercised the peremptory they used for Juror No. 40 on another juror and that this other juror's replacement would have voted for an acquittal.

Because of the highly speculative nature of these counterfactuals and in light of the very strong evidence against these Appellants, we cannot conclude with any reasonable probability that the district judge's omission regarding Juror No. 40, along with the error the district judge made with respect to Juror No. 2, necessarily affected the outcome of the district court proceedings. We do not, for example, have any basis in the record to conclude that the ex parte communications and what followed from them violated Appellants' Sixth Amendment right to an impartial jury or that any change in the jury composition -- whether or not it was impartial -- would have affected the outcome of the district court's proceedings. Cf. United States v. González-Meléndez, 594 F.3d 28, 34 (1st Cir. 2010)("[T]here is no basis in the record for concluding that the alteration in jury composition had an injurious influence on the verdict.").

Because Appellants cannot satisfy the third prong of the plain error test as articulated by the Supreme Court in Marcus,

they fail to satisfy the plain error test itself.  We thus need not reach the fourth prong, concerning whether "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  Marcus, 130 S. Ct. at 2164.

**D.  Arzola-Martínez's Allocution**

We next address a claim concerning Arzola-Martínez's right to allocute during sentencing.  Arzola-Martínez argues that the district court committed reversible error during his sentencing hearing when it granted him the opportunity to address his objections only to the PSR, a constraint which Arzola-Martínez argues violated Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) in not permitting him a full, personal opportunity to speak or present information to mitigate his sentence.  Arzola-Martínez thus requests that we remand his case to the district court for resentencing.

**1.  Standard / Scope of Review**

We review de novo a sentencing court's compliance with procedural rules, including Federal Rule of Criminal Procedure 32.  United States v. Burgos-Andújar, 275 F.3d 23, 28 (1st Cir. 2001).

**2.  Legal Framework**

Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) provides that, before imposing a sentence, the court must "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence."  Where the

-45-

court does not afford a defendant this opportunity or its functional equivalent, "the reviewing court must remand the case for resentencing, generally without needing to inquire into prejudice." United States v. Catalán-Román, 585 F.3d 453, 475 (1st Cir. 2009) (citing Burgos-Andújar, 274 F.3d at 28).

We have found that the right of allocution conferred to criminal defendants by Rule 32(i)(4)(A)(ii) can be satisfied by its "functional equivalent." United States v. Mescual-Cruz, 387 F.3d 1, 11 (1st Cir. 2004). "To achieve functional equivalency, the court, the prosecutor, and the defendant must at the very least interact in a manner that shows clearly and convincingly that the defendant knew he had a right to speak on any subject of his choosing prior to the imposition of sentence." Id. (citation and internal quotation marks omitted).

### 3. Analysis

During the sentencing hearing that the district judge conducted with Arzola-Martínez on July 28, 2008, the court discussed Arzola-Martínez's PSR with his counsel, Juan Pedrosa ("Pedrosa"). At the end of that discussion, during which Pedrosa raised several objections to the PSR, the court asked Pedrosa: "So, counsel, any other statements that you would be submitting on behalf of your client?" Pedrosa responded: "No, Your Honor, just for allocution on his behalf."

After Pedrosa allocuted on behalf of Arzola-Martínez, the district court stated that "[Pedrosa] mentioned that [his] client wanted to address the court," and so asked Arzola-Martínez: "Let me ask you if you have any objections, any other objections or any objections that you would like to discuss with the court, to the contents of the [PSR]?" After taking issue with some portions of the PSR, Arzola-Martínez argued that he was not guilty as a co-conspirator in Las Avispas Dos. He denied knowing certain witnesses or having visited certain places crucial to his conviction. After hearing Arzola-Martínez's statement, the court asked: "Any other statements[?]" Arzola-Martínez's counsel responded: "No [y]our Honor."

From the record of he sentencing transcript, several aspects of Arzola-Martínez's hearing are clear. The district judge provided Pedrosa with the opportunity to speak or present any information to mitigate the sentence of his client, Arzola-Martínez, which Pedrosa then did, asserting that he was doing so on his client's "behalf." The district judge then addressed Arzola-Martínez personally in soliciting any objections to the PSR specifically, which Arzola-Martínez then provided and took the opportunity to broaden into more general comments about the facts alleged in the instant case. Afterwards, in the context of this conversation between the district judge and Arzola-Martínez, the district judge generally provided further opportunity to speak or

present any information to mitigate the sentence by soliciting "[a]ny other statements," an invitation that Pedrosa answered in the negative on behalf of himself and his client. Although Pedrosa answered this question, it may well have been directed to Arzola-Martínez.

We find that Arzola-Martínez was afforded the functional equivalent of the right to allocute during his sentencing hearing. That the trial court did not address its final question to Pedrosa by name or otherwise seem to address the question to any particular person supports the conclusion that the district court did not deny Arzola-Martínez his allocution opportunity. See Green v. United States, 365 U.S. 301, 304 (1961) (finding that the district court did not deny the defendant the allocution opportunity to which Rule 32(a) entitled him where the trial judge's question, "Did you want to say something?," without being addressed to any particular person, "may well have been directed to the defendant and not to his counsel"); see also Domenica v. United States, 292 F.2d 483, 486 (1st Cir. 1961) (distinguishing Green, 365 U.S. 301, by noting that in Domenica "there can be no mistake [about to whom an invitation for allocution was directed]. . . [because] the court's question was addressed to counsel by name"). The totality of the circumstances suggests to us that the interactions between the court, the prosecutor, and Arzola-Martínez "show[] clearly and convincingly that the defendant knew he had a right to speak on any

subject of his choosing prior to the imposition of sentence." Mescual-Cruz, 387 F.3d at 11. We have held similarly in another case where a criminal defendant was not explicitly invited by the district court to speak on any subject of his choice. See United States v. O'Connell, 252 F.3d 524, 528 (1st Cir. 2001)(holding that the record demonstrated "clearly and convincingly" that criminal defendant "knew of his right to speak prior to the imposition of his sentence and that he took advantage of that opportunity by communicating those things that he found important to say" where defense counsel "seized the opportunity before the district court had the chance to address [the defendant] unprompted," "expressed his views on an appropriate sentence," and indicated that his client would like to address the court, which the client then did). Accordingly, the district court committed no error concerning Arzola-Martínez's allocution.

## E. Rivera-Rodríguez's Sentencing Based on Drug Quantity Responsibility

Rivera-Rodríguez argues that his sentence was based on an unreliable calculation of the quantity of drugs attributable to him. Specifically, he contends, the district court committed clear error in determining that the average weight of each crack capsule at the Borinquen Ward drug point was 0.075 grams, as this calculation was unsubstantiated by the evidence presented at trial. The district court, Rivera-Rodríguez argues, thus erroneously found him responsible for a total of more than 4.5 kilograms of crack

-49-

cocaine.[12]  Rivera-Rodríguez requests that we remand this issue to the district court for resentencing.

### 1.  Standard / Scope of Review

"We review the district court's factual finding as to drug quantity for clear error."  United States v. Correa-Alicea, 585 F.3d 484, 489 (1st Cir. 2009) (citation omitted); see also United States v. Feliciano-Rodríguez, 525 F.3d 85, 107 (1st Cir. 2008)("A district court's factual finding regarding the amount of drugs attributable to a member of a drug conspiracy will be disturbed only if it is clearly erroneous."(citation omitted)).  We have found that, to determine drug quantity, a district court

> looks to all acts that were part of the same course of conduct or common scheme or plan as the offense of conviction, and takes into account not only what the defendant knew, but what conduct he reasonably foresaw. . . . Thus, each co-conspirator is responsible not only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy.  The trial court's determination of drug quantity need only be by a preponderance of the evidence and is not required to be an exact determination but rather only a reasoned estimate.  Further, if the trial court bases its estimate on one of two plausible views, the determination is not clearly erroneous.

---

[12]  Rivera-Rodríguez does not challenge the mathematical formula and hypotheticals that the district court employed to conclude that if a vial of crack cocaine weighed 0.075 grams, Rivera-Rodríguez would be responsible for a total of more than 4.5 kilograms of crack cocaine.  We thus focus only on Rivera-Rodríguez's challenge to the average weight of each vial.

<u>Feliciano-Rodríguez</u>, 525 F.3d at 107 (internal citations and quotation marks omitted). We also review for clear error challenges to factual findings made at sentencing. <u>United States</u> v. <u>Shinderman</u>, 515 F.3d 5, 18 (1st Cir. 2008).

### 2. Factual Findings

José A. Mercado-Negrón ("Mercado-Negrón"), a chemist who had worked twenty-six years for the Puerto Rico Forensic Science Institute, where he analyzed controlled substances, including crack cocaine, testified at trial. He stated that he had analyzed controlled substances in "thousands of cases" and had testified as an expert witness in federal court approximately five to six times and in state court hundreds of times. Mercado-Negrón further stated that, based on his experience analyzing crack cocaine seized in the area of Guayama, the average weight of a capsule of such crack cocaine was approximately 0.075 grams. Based on his testimony, the district court concluded that, in a given year, Las Avispas Dos could distribute 27 kilograms of crack cocaine and, through the life of the conspiracy, 109 kilograms of crack cocaine.

### 3. Analysis

Rivera-Rodríguez makes much ado about the fact that Mercado-Negrón did not personally weigh the capsules of crack cocaine distributed by Las Avispas Dos and instead relied on his experience to provide his estimate of 0.075 grams per capsule. As Rivera-Rodríguez points out, at trial, the only exhibit upon which

Mercado-Negrón relied was of powder cocaine, not crack cocaine. That exhibit contained two bags of powder cocaine totaling 0.080 grams that Rivera-Rodríguez sold to Luis A. Sepúlveda-Rivera ("Officer Sepúlveda-Rivera"), a member of the PRPD, in July 2006 while Officer Sepúlveda-Rivera was working undercover. Furthermore, Rivera-Rodríguez points to testimony of Rivera-Díaz in which Rivera-Díaz stated that he did not weigh the amounts of crack cocaine he placed into vials to be sold because he did not have the proper equipment to do so and because he did not pay attention to exactly what amount of crack cocaine he would measure and then deposit into the vials.

We find that the district court did not clearly err in relying on Mercado-Negrón's figure of 0.075 grams of crack cocaine per capsule even though Mercado-Negrón did not personally weigh the capsules of crack cocaine at issue in this case. "The court's finding as to drug quantity was not a mere hunch or intuition, but was a reasoned estimate based on reliable evidence in the record." Correa-Alicea, 585 F.3d at 490 (internal citation and quotation marks omitted). The district court's reasoned estimate here was based on Mercado-Negrón's extensive experience as a forensic chemist specializing in controlled substances, including crack cocaine, for which he was admitted to testify at trial as an expert, and he had previously analyzed crack cocaine seized from the location in which Las Avispas Dos operated. Rivera-Rodríguez

also presented no developed argument about an alternative weight on which the district court could rely to formulate its calculations for sentencing. It was thus in the district court's discretion to rely on Mercado-Negrón's testimony in assessing the drug quantity for which Rivera-Rodríguez was responsible. See United States v. Rivera-Maldonado, 194 F.3d 224, 228 n.2 (1st Cir. 1999) ("The sentencing court possesses broad discretion in determining which data are sufficiently dependable for sentencing purposes."). Indeed, other circuits "have endorsed other practices that yield only very rough estimates of quantity." United States v. Uwaeme, 975 F.2d 1016, 1019 (4th Cir. 1992).

## F. Arzola-Martínez's and Pabón-Mandrell's Sentencing Based on Prior Criminal History

Arzola-Martínez and Pabón-Mandrell argue that the district court, in calculating their sentences, erroneously used their prior criminal histories. Arzola-Martínez contends that the district court improperly used his prior simple possession deferrals, which he argues never became final convictions, to apply the three strikes mandatory life imprisonment provisions of 21 U.S.C. §§ 841(b)(1)(A), 851, and 860. Pabón-Mandrell contends that the district court improperly utilized his two simple possession narcotics convictions, the underlying conduct of which was specifically included as an overt act of Count One, to apply the three strikes mandatory life imprisonment provisions of 21 U.S.C. §§ 841(b)(1)(A), 851, and 860. Arzola-Martínez and Pabón-Mandrell

-53-

thus request that we set aside their sentences and remand their cases to the district court for resentencing.

The government responds that Arzola-Martínez and Pabón-Mandrell's sentences should be affirmed because their prior felonies were sufficient under 21 U.S.C. § 851. As discussed below, we agree.

### 1. Standard / Scope of Review

We review de novo questions of the proper interpretation of statutes, including whether prior convictions count for purposes of 21 U.S.C. § 851. See United States v. Lino, 493 F.3d 41, 43 (1st Cir. 2007). To trigger "a mandatory term of life imprisonment without release," 21 U.S.C. § 841(b)(1)(A) requires that the defendant have "two or more prior convictions for a felony drug offense" and that those prior convictions "have become final."

### 2. Analysis

#### a. Arzola-Martínez's Sentencing

To support its determination that Arzola-Martínez was subject to a life sentence under the provisions of 21 U.S.C. § 841(b)(1)(A), the district court cited three instances in 2000 in which Arzola-Martínez was found in possession of marijuana and/or crack cocaine. These arrests and related charges were processed by the Commonwealth of Puerto Rico. The cases were consolidated and, in 2001, upon Arzola-Martínez's guilty plea to the charges, the Puerto Rico Superior Court ("PRSC") placed Arzola-Martínez on

probation for a term of eighteen months under a rehabilitation program. Pursuant to a favorable 2002 report by the coordinator of Arzola-Martínez's rehabilitation program, the PRSC expunged what the PSR termed the "conviction" resulting from these incidents.

Arzola-Martínez argues that, contrary to the requirements of 21 U.S.C. § 841(b)(1)(A), none of these instances, which Arzola-Martínez characterizes as "simple drug possession cases," qualify as a "prior conviction[]" that has "become final." Arzola-Martínez bases this contention on his argument that, "since no conviction nor finding of guilt was ever entered[,] no appeal could have been taken." To support this conclusion, Arzola-Martínez notes that he entered the rehabilitation program and the PRSC expunged the record of these two cases. He further observes that Puerto Rico Rule of Criminal Procedure 247.1 provides that the rehabilitation program be "implemented without a finding of guilt" and "shall not be deemed as a conviction."

Arzola-Martínez's arguments are unavailing. The Supreme Court and our circuit indicate that federal law and not, as Arzola-Martínez argues, Puerto Rico Rule of Criminal Procedure 247.1 determines whether these instances constitute prior convictions under 21 U.S.C. § 851. Cf. Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 111-12 (1983) ("Whether one has been 'convicted' within the language of the gun control statutes is necessarily . . . a question of federal, not state, law, despite the fact that

-55-

the predicate offense and its punishment are defined by the law of the State. This makes for desirable national uniformity unaffected by varying state laws, procedures, and definitions of 'conviction.'" (internal citations omitted)); <u>United States</u> v. <u>Bustamante</u>, 706 F.2d 13, 14 (1st Cir. 1983) (describing the holding in <u>Dickerson</u>). Although <u>Dickerson</u> and <u>Bustamante</u> related to the federal gun control statute, we see no justification why their underlying reasoning should not be applied, as here, to felony drug offenses. Indeed, we have already cited the principles for which <u>Dickerson</u> and <u>Bustamante</u> stand in adjudicating other cases involving felony drug offenses. <u>See</u> <u>United States</u> v. <u>Cuevas</u>, 75 F.3d 778, 782 (1st Cir. 1996)("The decisions in <u>Dickerson</u> and <u>Bustamante</u> still stand for the proposition that, absent legislative indication to the contrary, the meaning of 'conviction' for purposes of a federal statutory scheme is to be determined under prevailing federal law."). Consequently, we find that the district court properly considered Arzola-Martínez's prior criminal history based on federal -- not state -- law.

Moreover, we find that these incidents do constitute "convictions" for the purposes of 21 U.S.C. § 851. We agree with our sister courts of appeals that,

> [f]or purposes of sentences imposed under § 841, . . . Congress has not exempted from the "prior convictions" that must be counted those convictions removed from a criminal record for policy reasons unrelated to innocence or an error of law. The courts of

appeals that have considered this § 841 question therefore have counted prior felony drug convictions even where those convictions had been set aside, expunged, or otherwise removed from a defendant's record for such reasons.

United States v. Law, 528 F.3d 888, 911 (D.C. Cir. 2008)(citing cases from the Second, Third, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits).  We thus find that Arzola-Martínez's prior offenses qualify as "convictions" pursuant to 21 U.S.C. § 851.

### b.  Pabón-Mandrell's Sentencing

On March 30, 2005, Pabón-Mandrell was arrested for illegally possessing, with the intent to distribute, cocaine ("the 2005 incident").  His conviction became final on June 20, 2006, when he was sentenced to probation.  Pabón-Mandrell argues that, when the government chose to include the 2005 incident as part of Count One,[13] the government "waived the right to claim the local conviction arising out of said incident as a predicate 'prior' conviction for purposes of qualifying [Pabón-Mandrell] as a third strike offender."  Pabón-Mandrell bases this argument on our holding in United States v. De Jesús-Mateo that "[p]rior felony drug convictions will be counted separately for purposes of 21 U.S.C. § 841(b) only when they represent distinct criminal

---

[13]  The indictment's section on "Overt Acts in Furtherance of the Conspiracy" includes the following: "On or about March 30, 2005, [Pabón-Mandrell] possessed a measurable amount of cocaine and marihuana, in or around the area of a 'drug distribution point', located in Borinquen Ward, Guayama, PR."

-57-

episodes," 373 F.3d 70, 74 (1st Cir. 2004)(emphasis added)(citation omitted), and that the March 2005 incident was not a "distinct criminal episode[]" from the charged offense in Count One. Regardless, the district court did include the 2005 incident in making its determination that the three strikes mandatory life term applied to Pabón-Mandrell.

The same case Pabón-Mandrell cites settles this matter. In De Jesús Mateo, we held that our circuit's precedent forecloses the argument that prior convictions do not represent "distinct criminal episodes" when they are part and parcel of a defendant's participation in a drug trafficking conspiracy. 373 F.3d at 74 (holding that prior convictions for separate drug transactions that were eleven months apart constituted separate criminal episodes even though the conduct underlying both convictions was arguably part of the same conspiracy). Our reasoning in De Jesús-Mateo relied on an earlier ruling, in United States v. Martínez-Medina, in which we quoted a Ninth Circuit opinion stating that

> [a]n ongoing course of criminal conduct such as narcotics trafficking may involve many such criminal episodes, each a discrete occurrence. The fact that all are related, part of a series, or part of a continuous course of criminal dealing, does not necessarily render them a "single" criminal episode, particularly where the episodes occur over time. To so hold would insulate the very career criminals the statute is designed to reach -- those continuously engaged in criminal conduct.

279 F.3d 105, 123 (1st Cir. 2002)(quoting United States v. Maxey, 989 F.2d 303, 307 (9th Cir. 1993)(holding that the district court properly imposed a life sentence under 21 U.S.C. § 841(b)(1)(A) because the defendant's prior convictions, although part of one drug trafficking conspiracy, stemmed from several transactions occurring several months apart)). We also have previously held that "[a] prior drug conviction constitutes a 'distinct criminal episode' sufficient to trigger the enhancement so long as the defendant continued to participate in drug activity after the conviction became final." Lino, 493 F.3d at 43.

The 2005 incident, despite being part of the drug conspiracy of which Pabón-Mandrell was charged in the instant case, constitutes a "distinct criminal episode[]" because Pabón-Mandrell continued to participate in drug activity after that conviction became final. Rivera-Díaz and Brito-Pacheco testified at trial that Pabón-Mandrell was the "runner" of heroin for Las Avispas Dos. Irving Ofray-Vázquez ("Agent Ofray-Vázquez"), an FBI agent, testified during Pabón-Mandrell's sentencing hearing that Pabón-Mandrell participated in the drug conspiracy charged in the instant case even after he was convicted for the 2005 incident and put on probation in June 2006. Specifically, Agent Ofray-Vázquez testified that, as late as December 2006, Pabón-Mandrell was still a leader of Las Avispas Dos at the La Pluma drug point. As evidence to support this conclusion, Agent Ofray-Vázquez cited the

statement of a cooperating witness who reported that, in almost all cases, either Pabón-Mandrell or another man would pick up money from or take drugs to be sold at La Pluma. Agent Ofray-Vázquez also stated that further testimony provided to him by informants, including Rivera-Díaz, indicated that Pabón-Mandrell had a "big role" in Las Avispas Dos from its inception in 2003 until law enforcement ceased its operations in 2007. Agent Ofray-Vázquez also testified that, even after June 2006, while he was conducting surveillance on the areas, Agent Ofray-Vázquez "always" saw Pabón-Mandrell at both the La Pluma and Las Vías drug points.

The mere fact that Pabón-Mandrell's conduct during the March 2005 incident was cited in the list of overt acts in the instant case's indictment does not mean the government waived its assertion that the associated conviction was a prior conviction for purposes of qualifying Pabón-Mandrell as a third strike offender. Although there is no indication that the conduct leading to the prior convictions at issue in De Jesús-Mateo was listed in that case's indictment, the distinction does not compel a different outcome here. In De Jesús-Mateo, we explicitly noted the failure of the defendant's attempt to distinguish his case from Martínez-Medina on the basis that, in De Jesús-Mateo, "the government presented evidence of marijuana trafficking . . . which was the same conduct underlying De Jes[ú]s's prior marijuana conviction." 373 F.3d at 75 n.3. We observed that

> [t]he dispositive point here is not that evidence of De Jes[ú]s distributing marijuana was presented at his conspiracy trial but rather that his prior cocaine conviction was a separate criminal episode from his prior marijuana conviction even though the conduct underlying both convictions was arguably part of the same conspiracy. As for any claim that the conspiracy comprised the same episode as either of the two prior convictions, the short answer is that the conviction in this case was for conspiring to distribute heroin and cocaine, an episode continuing well beyond either of the prior convictions for discrete episodes of possession and distribution.

Id. Similarly, the dispositive point here is not that an allegation of Pabón-Mandrell possessing, with the intent to distribute, cocaine was included as an overt act in the indictment in the instant case but rather that his prior cocaine conviction was a separate criminal episode from his conspiracy conviction even though the conduct underlying both convictions was arguably part of the same conspiracy. Pabón-Mandrell's conviction in the instant case was for conspiring to possess with intent to distribute and actual distribution of narcotics, an episode continuing well beyond his prior conviction for a discrete episode of possessing, with the intent to distribute, cocaine.

Both Arzola-Martínez and Pabón-Mandrell also argue that at least one of the prior convictions that the district court counted in sentencing each of them to the three strikes life terms should not, in fact, count because the law's "absurd result" of punishing "cases of simple possession involving small amounts of

drugs" is "counter to Congressional intent" to punish "dangerous narcotics traffickers." While acknowledging that the "literal application of the language utilized in the statute may appear to foreclose any further analysis concerning its proper application" here, to support their contentions, these two Appellants nonetheless cite the Supreme Court's decision in Green v. Bock Laundry Mach. Co., 490 U.S. 504, 510-11 (1989), in which the Court held that a statute's literal interpretation can be ignored if it "can't mean what it says" (citation omitted). See also id., 490 U.S. at 527 (Scalia, J., concurring)(suggesting that the literal interpretation of a statute can be ignored if it "produces an absurd, and perhaps unconstitutional, result"). However, besides punishing serious drug offenders, we have observed that an additional purpose of such a sentencing enhancement is to punish recidivism. See Lino, 493 F.3d at 43. Such recidivism is a concern with both of these Appellants, given that their prior convictions and the instant case all relate to drug offenses. "Indeed, if the rule advocated by [Arzola-Martínez and Pabón-Mandrell] were adopted, we would insulate the very career criminals the [enhancement] is designed to reach -- those continuously engaged in criminal conduct." Id. at 43-44 (citation and internal quotation marks omitted) (alterations in the original). As such, imposing the three strikes life term on Arzola-Martínez and Pabón-

Mandrell for these repeat offenses is neither absurd nor a violation of Congressional intent.

In sum, we find that the district court did not err in counting the aforementioned instances as "prior convictions" that led the district court to impose the three strikes life term on the felony drug offense repeat offenders Arzola-Martínez and Pabón-Mandrell.

### III.  Conclusion

We conclude that there was sufficient evidence adduced at trial for the jury to convict Arzola-Martínez, Muñiz-Massa, and Rivera-Moreno.  We further conclude that the ex parte conversations that the district judge held with prospective jurors were not plain error.  Moreover, the district court did not err with respect to the various sentencing claims made by Arzola-Martínez, Rivera-Rodríguez, and Pabón-Mandrell.  Accordingly, the judgment of the district court is affirmed.

**Affirmed**.