# United States Court of Appeals
## For the First Circuit

Nos. 09-2235, 09-2239

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN A. MEISES, a/k/a DAVID VAZQUEZ-COSS, a/k/a JUAN A. MIESES,
and JOSE L. REYES-GUERRERO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Lipez, Leval,* and Thompson, Circuit Judges.

Leslie W. O'Brien for appellant Reyes-Guerrero.
Rafael F. Castro Lang for appellant Meises.
Courtney L. Coker, Assistant United States Attorney, with whom
Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-
Sosa, Assistant United States Attorney, Chief, Appellate Division,
and Luke Cass, Assistant United States Attorney, were on brief, for
appellee.

May 13, 2011

*Of the Second Circuit, sitting by designation.

**LIPEZ, Circuit Judge**. Appellants Juan Mieses[1] and Jose Reyes-Guerrero were arrested in a reverse sting operation after they drove to a sham drug deal, with a third co-defendant, in a vehicle containing $100,000 in cash.[2] A jury found both appellants guilty of a single drug conspiracy count. On appeal, the pair claim that their convictions must be vacated because of three significant errors at trial: (1) the government's use of improper overview testimony from the lead law enforcement agent in the case, (2) the indirect admission of the third co-defendant's out-of-court statement implicating appellants, and (3) the district court's refusal to allow the jury to hear an audiotape recorded on the day of their arrests.[3] Reyes-Guerrero further asserts that he is entitled to a judgment of acquittal because the evidence was insufficient to support the jury's verdict.

As we shall explain, the overview testimony at issue here was improper and, to its credit, the district court acknowledged the error when it considered appellants' post-trial motions for acquittal. See United States v. Reyes-Guerrero, 638 F. Supp. 2d

---

[1] The indictment and other court documents spell "Mieses" as "Meises," and we do likewise in the official caption of this case. In the remainder of the opinion, however, we adopt the spelling used by Mieses in his brief.

[2] In a classic sting operation, an undercover agent attempts to purchase drugs from a suspect. In a reverse sting, agents offer to sell drugs to their targets. United States v. Pinillos-Prieto, 419 F.3d 61, 64 (1st Cir. 2005).

[3] Only Mieses challenges the admission of the audiotape.

177, 185-90 (D.P.R. 2009). We also conclude that the district court erred in allowing testimony revealing the co-defendant's inculpatory statement. Those two significant errors entitle appellants to a new trial, and we therefore vacate their convictions and remand for such new proceedings.[4]

**I.**

## A. Factual Background

The facts underlying appellants' convictions, viewed in the light most favorable to the jury's verdict, see United States v. Poulin, 631 F.3d 17, 18 (1st Cir. 2011), are as follows.

Puerto Rico Police Sergeant Roberto Cruz, a member of a federal drug task force,[5] worked undercover in 2007 in an investigation targeting Genito Toribio-Custodio ("Custodio"), an alleged trafficker who operated in the Dominican Republic and Puerto Rico. Also participating in the undercover investigation was Marcos Antonio Torres, a longtime drug trafficker who had been a paid government informant since 2005.[6] The undercover operation

---

[4] We explain in Section II why we reject Reyes-Guerrero's sufficiency argument.

[5] At the time of the trial in this case, Cruz had been assigned to the United States Drug Enforcement Administration's (DEA) Task Force for fourteen years.

[6] Torres testified that he began drug trafficking when he was sixteen and continued until he was arrested about two decades later.

ended prematurely when Custodio detected surveillance units and fled from Puerto Rico to the Dominican Republic.

Seeking to reactivate the investigation the next year, Cruz instructed Torres to solicit Custodio for a cocaine deal in Puerto Rico. On June 19, 2008, in the first of a series of recorded phone calls, Torres informed Custodio that he had 220 kilograms to sell. Initially cautious, Custodio asked Torres if he still communicated with Cruz, whom Custodio did not trust. Torres said they were not in touch. Although Custodio originally said he would travel to Puerto Rico within a few days, he instead arranged for his "partner" – Dario Pereyra-Rubis ("Rubis") – to carry out the deal. A few days later, during a meeting in San Juan that Torres recorded, Rubis expressed interest in buying 150 kilograms of cocaine and proposed paying for them after his clients paid him. Torres told Rubis that he could deal only in twenty-five kilogram amounts, and he would provide the drugs only if Rubis brought $100,000. Rubis contacted a client by phone to advise that a deal was in the works, and he then left to consult with the client face-to-face.

In a follow-up phone call with Custodio, who had already spoken with Rubis, Torres repeated his refusal to defer payment for the drugs and offered to accept a $100,000 deposit. In another phone call the same evening, when Rubis insisted on getting the drugs without cash down, Torres told Rubis that his buyers should

-4-

come with the money "so that they are present in the negotiation" and they "know where their money is." Rubis said he would continue to try to reach an agreement.

Sensing continuing mistrust on the part of Rubis and Custodio, Cruz arranged for Torres to show Rubis sham kilograms of cocaine – packages of wood wrapped with the type of tape commonly used by drug traffickers. Their meeting at a shopping center on June 26 was videotaped, and Cruz also was on the scene as part of the surveillance team. Rubis's concerns apparently were resolved when he saw the "cocaine," and Torres testified that Rubis became "in a hurry to make the deal."

In a series of conversations between Rubis and Torres on the morning of June 27, the deal was confirmed for fifteen kilograms at $14,000 apiece, with $100,000 in cash to be paid on the spot and the balance due a day later. Torres testified that, in the first call, Rubis reported that he was "with the people, the owners of the money with the money; and that he was desperate to . . . make the deal, and he didn't want the people to get bored and leave." They agreed to meet at 2 p.m., and in a subsequent call Torres told Rubis to come to the shopping center where they had previously met.

DEA Task Force members, including Cruz, set up surveillance with videotaping equipment near the shopping center. Agents saw Rubis arrive at the shopping center alone in a green

Mazda that belonged to appellant Reyes-Guerrero, briefly leave the area, and then return with Mieses and Reyes-Guerrero in a Ford minivan. Mieses was driving, Reyes-Guerrero was in the front passenger seat, and Rubis was sitting in the back. Mieses dropped Rubis off near where Torres, equipped with a small audio recorder, was waiting, and then drove on a short distance before parking the van. When Torres asked why Rubis was late, Rubis replied that he had arrived earlier, but he needed to wait for "the owners of the money" to come with the cash. After Torres complained that he did not want to meet anyone else, Rubis explained that "the people" would not give the money to him (i.e., Rubis) because they did not trust him. Asked if the owners were there yet, Rubis said they were "in their car," and he then escorted Torres to the minivan. Torres testified that, as they proceeded to the vehicle, Rubis assured him that these individuals were trustworthy and that he had previously carried out drug transactions with them.

According to Torres, when he and Rubis arrived at the passenger side of the van, Reyes-Guerrero rolled down his window and Rubis briefly introduced the men. Reyes-Guerrero directed them to "get in" the car, but Torres refused because he feared being kidnapped. Torres then asked if they were ready; Mieses replied "yes" and Reyes-Guerrero nodded. Torres asked to see the money, prompting Mieses to reach behind his seat and, with Reyes-Guerrero's help, pull out a shoe box. Reyes-Guerrero passed the

box to Torres, who opened it and asked how much money it contained. After responding "$100,000," Mieses asked about "the merchandise," and Torres told him that it was in his car. Mieses then asked, "How are we going to do this?" Torres responded that he would return to his car and drive off, and the others should follow. As Torres walked away from the minivan, he passed his hand over his head in a prearranged signal to let Cruz know that he had seen the money and the deal was underway.

Significantly, although the conversation between Torres and Rubis in the parking lot was recorded by the device Torres carried, the exchange among the men at the minivan could not be heard on the tape. Cruz attributed the glitch to background traffic noise at that location, and Torres testified that a gap is not unusual when he carries a recording device. Cruz and the other Task Force members were too far away from the minivan to hear the men talking, and the jury thus heard only Torres's account of what was said there.[7]

After Torres signaled Cruz, Mieses and Reyes-Guerrero were quickly arrested, and Rubis, who had tried to flee, was apprehended several blocks away. A blue Reebok shoe box containing $100,000 was recovered from the van, and a subsequent inspection of

[7] In fact, no transcript was made from any part of that day's audiotape, and the tape was not played for the jury. Torres's testimony was thus the only evidence on what was said throughout the June 27 episode, including during the exchange between Torres and Rubis before they approached the minivan.

-7-

the vehicle revealed a hidden compartment beneath the rear floor. Rubis indicated a willingness to cooperate with law enforcement authorities, and he was interviewed at the DEA offices by Cruz and another Task Force agent. Cruz testified that, after the interview, the targets of his investigation changed, and he reported that Reyes-Guerrero and Mieses were immediately processed and detained. Rubis, Reyes-Guerrero, and Mieses were all charged with a single count of conspiracy to possess five or more kilograms of cocaine with intent to distribute the drugs. See 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A).

## B. Procedural Background

During appellants' five-day trial in February 2009, the government presented the details of the reverse sting largely through the testimony of Cruz and Torres. The jury also heard the audio recordings of the preparatory telephone calls involving Rubis, Torres, and Custodio and saw the videotapes of the sham cocaine display and the attempted transaction. Despite defendants' objections, the court allowed the prosecutor to ask Cruz what role defendants played within the drug trafficking organization. Cruz identified Mieses as "one of the buyers," and Reyes-Guerrero as "the other buyer." Cruz also described them as the "owners of the money." Mieses and Reyes-Guerrero defended by arguing "mere presence," attempting to persuade the jury that they were merely

bystanders to Rubis's drug deal.[8]  The strategy was unsuccessful, and both men were found guilty.

In post-trial motions for judgments of acquittal, appellants challenged the court's instruction on "mere presence" and asserted that the court erred in allowing Cruz to present overview testimony that was based on hearsay.  They further argued that the evidence adduced by the government was insufficient as a matter of law to support the guilty verdicts.

In a thorough and thoughtful opinion, the district court acknowledged that Cruz's testimony about appellants' roles in the drug transaction had been improperly admitted, Reyes-Guerrero, 638 F. Supp. 2d at 190, and that the error "may have constituted sufficient grounds for the granting of a new trial pursuant to a harmless error standard." Id. at 179 n.1.  Because the defendants had not moved for such relief, however, the court addressed only their request for acquittal.  Id.  It concluded that Torres's testimony alone provided ample support for findings of guilt beyond a reasonable doubt, id. at 192-93, and it therefore denied the motions.[9]

On appeal, appellants raise four arguments. First, they jointly reiterate their contention that admission of Cruz's

_____

[8] Rubis disappeared after posting bond and has not been tried.

[9] The court rejected the appellants' claim of instructional error.

overview testimony – specifically, his assertions that they played the role of buyers – was reversible error. Second, they challenge the admission of Cruz's testimony about his post-arrest interview with Rubis. They argue that Cruz's revelation that after the interview the targets of his investigation changed necessarily implied a statement by Rubis identifying Mieses and Reyes-Guerrero as co-conspirators in the drug deal. Admission of that implied out-of-court statement, they assert, violated their rights under the Confrontation Clause of the Sixth Amendment. Third, Mieses challenges the court's refusal to allow the jury to hear a portion of the audio recording made by Torres on June 27. Mieses insists that the recording was relevant to the jurors' appraisal of Torres's testimony about the conversation at the minivan and why it was not captured on the tape. Finally, Reyes-Guerrero renews his sufficiency argument, which is where we begin our discussion.

## II.

Reyes-Guerrero argues that he is entitled to a judgment of acquittal because a conspiracy charge requires proof of the defendant's "own words or actions" and the record in this case involves only "the mouth of the government informant." He asserts that Torres's uncorroborated testimony is insufficient to support a finding that Reyes-Guerrero was a knowing and voluntary participant in a conspiracy, see United States v. Bristol-Mártir, 570 F.3d 29, 39 (1st Cir. 2009), and he insists that the jury could

properly conclude only that he happened to be present when Rubis transacted a drug deal.

Reyes-Guerrero undervalues the evidence against him.[10] The testimony of a single witness can be enough to support the government's case, United States v. De La Paz-Rentas, 613 F.3d 18, 24-25 (1st Cir. 2010), and even the uncorroborated testimony of an informant may suffice "to establish the facts underlying a defendant's conviction," United States v. Merlino, 592 F.3d 22, 30 (1st Cir. 2010). The jury assesses witness credibility, United States v. Rivera-Rodríquez, 617 F.3d 581, 596 n.6 (1st Cir. 2010), and the jurors in this case were properly informed about Torres's drug-dealing past and cautioned about accepting his testimony.[11]

Moreover, the government did not rest solely on informant testimony to rebut Reyes-Guerrero's mere presence defense. The government also introduced recordings of phone conversations, videotapes, and Cruz's testimony based on direct surveillance. The early phone conversations between Torres and Rubis indicated that

---

[10] For purposes of our sufficiency analysis, we do not consider the testimony of Cruz to which appellants have objected.

[11] In its pre-deliberations charge to the jury, the court gave the following instruction:

> You have heard the testimony of Mark Anthony Torres. He provided evidence under contract agreements with the Government and received money from the Government in exchange for providing information. Some people in this position are truthful when testifying. Still, you should consider the testimony of Mark Anthony Torres with particular caution.

Rubis was acting as a broker for buyers who were reluctant to part with their cash before obtaining drugs, and the events on the morning of the scheduled transaction permitted the jury to infer that appellants were those buyers. Moreover, Rubis reported in one call that he was with the "owners of the money," and he later appeared for the deal with Mieses and Reyes-Guerrero – and the money. Reyes-Guerrero's travel to the scene of the transaction, in a vehicle containing a hidden compartment suitable for transporting drugs, was his own conduct that has considerable significance in light of the other evidence. In addition, Rubis told Torres he originally had arrived early for the transaction but then was delayed because he had to wait for the buyers. That explanation as recounted by Torres – i.e., Rubis's early arrival and subsequent return – matched the observations of the Task Force agents on the scene.

The informant testimony, if believed by the jury, was particularly damaging. Torres testified that Reyes-Guerrero nodded his head when asked if he was ready to proceed with the deal, signaling active participation. Although Torres's report that Reyes-Guerrero had helped to retrieve the box of money from behind the driver's seat was more ambiguous, it was nonetheless additional evidence that the jury could have viewed as proof of Reyes-Guerrero's complicity in the transaction. The jury thus had before it sufficient evidence pointing to Reyes-Guerrero's guilt.

Although a guilty verdict was not inevitable – as we explain below – our rejection of Reyes-Guerrero's sufficiency claim is not inconsistent with our decision to vacate appellants' convictions. Our concerns, and the stakes, are considerably different when we evaluate the sufficiency of the evidence to support a jury verdict than when we assess the impact of discrete evidentiary errors on that verdict. If even the properly admitted evidence would not permit a reasonable jury to find guilt beyond a reasonable doubt, the government has failed to prove its case and the defendant is entitled to acquittal. If, instead, the properly admitted evidence is sufficient to prove guilt, but other, erroneously admitted evidence might have influenced the verdict, our concern is that the defendant was denied a fair trial. The remedy in such circumstances is a new trial, not acquittal.

Here, taking into account only the evidence whose admission is not challenged, the record was sufficient for a jury to conclude beyond a reasonable doubt that Reyes-Guerrero was more than an innocent bystander to Rubis's transaction. Hence, we affirm the district court's denial of his motion for acquittal.

**III.**

Appellants assert three evidence-related errors. Two are claims of wrongful admission of testimony by Cruz: his overview testimony identifying appellants as the buyers in the drug deal and his report about his post-arrest interview with Rubis. The third

claim, raised only by Mieses, is that the court erred in refusing to admit a portion of the audiotape recorded on the day of the attempted cocaine purchase. We discuss the merits of each of these contentions before turning to the question of harmless error.

## A. Cruz's Overview Testimony

In United States v. Flores-de-Jesús, 569 F.3d 8 (1st Cir. 2009), we reviewed at length why the government must be wary of using a law enforcement agent in a multi-defendant drug trial to provide an "overview" of the prosecution's case, and we sharply criticized the U.S. Attorney's Office in Puerto Rico for its repeated improper use of the practice. See id. at 16-27; see also United States v. Casas, 356 F.3d 104, 117-20 (1st Cir. 2004). Both Flores-de-Jesús and our earlier decision in Casas particularly condemned testimony from an agent, not based on personal knowledge, describing the roles played in the drug conspiracy by individual defendants. Flores-de-Jesús, 569 F.3d at 16, 24; Casas, 356 F.3d at 118-19. Such descriptions amount to impermissible testimony from the agent "that each of the defendants was guilty of the conspiracy charged." Casas, 356 F.3d at 119 (quoted in Flores-de-Jesús, 569 F.3d at 24).

In similar fashion to Flores-de-Jesús and Casas, the lead law enforcement officer in this case, Agent Cruz, was called as the first witness at trial. He testified to the step-by-step progression of the investigation, describing the phone calls and

-14-

meetings that culminated in the arrests at the shopping center. At the end of the direct examination, after confirming that Cruz had listened to all of the phone calls and audio recordings, conversed with and supervised Torres, and watched the meetings between Rubis and Torres that were videotaped, the prosecutor asked Cruz what role each individual had played in the conspiracy. Cruz testified that Rubis was "a broker within the drug trafficking organization," Mieses "in this deal was one of the buyers," and Reyes-Guerrero was "the other buyer."

Flores-de-Jesús was issued approximately four months after the trial in this case, between appellants' filing of post-trial motions for judgment of acquittal and the district court's ruling on the motions. In its decision on the motions, the district court observed that Flores-de-Jesús had drawn "clear boundaries between permissible and impermissible 'overview testimony' at the beginning of trial." 638 F. Supp. 2d at 188 (citing Flores-de-Jesús, 569 F.3d at 19-20). It concluded that, although a case agent may describe the course of an investigation to provide background information, Cruz's pronouncement that the defendants were the buyers was plainly improper. Id. The testimony did not satisfy the requirements for lay witness testimony under Federal Rule of Evidence 701, the court held, because it was "not based squarely on

-15-

personal knowledge." <u>Id.</u> at 189.[12] Cruz was not a participant in the attempted drug deal and, "[i]mportantly, . . . was unable to hear any of the words allegedly spoken by the defendants at the time the informant approached them to make the drug exchange." <u>Id.</u>

On appeal, appellants argue that the impermissible role-in-the-offense testimony was reversible error entitling them to a new trial. The government insists that Cruz's testimony did not violate the principles outlined in <u>Flores-de-Jesús</u> and <u>Casas</u> because, unlike the agents in those cases, Cruz directly participated in every aspect of the investigation. The government recounts the evidence to which Cruz was directly exposed – the conversations and meetings between Rubis and Torres, and the encounter at the van – and argues that Cruz's "testimony about [appellants'] roles as buyers was based on his perception of events that he participated in and was therefore proper lay opinion testimony under Rule 701."

---

[12] Rule 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

The government is correct that this case differs from Flores-de-Jesús and Casas. Those cases both involved wide-ranging overview testimony by law enforcement agents whose descriptions of the conspiracies at issue relied heavily on information told to them by others – i.e., on inadmissible hearsay – rather than on their own personal knowledge. See Flores-de-Jesús, 569 F.3d at 24; Casas, 356 F.3d at 119.[13] By contrast, Cruz played a hands-on role in nearly every aspect of the investigation underlying this case, and most of his testimony consisted of describing the sequence of events that he had seen and heard. Such testimony is permissible and "valuable to provide background information and to explain how and why the agents even came to be involved with th[e] particular defendant[s]." Flores-de-Jesús, 569 F.3d at 19 (internal quotation marks omitted) (first alteration in original).[14]

---

[13] Overview evidence often provides an anticipatory summary of the prosecution's case by previewing the testimony of other witnesses. See Flores-de-Jesús, 569 F.3d at 16-17. In Casas, the circumstances were "particularly problematic" because the agent's testimony "was likely based on the testimony of a cooperating co-conspirator whom the government chose not to call at trial," leaving the defendants unable to cross-examine the cooperator or "'challenge a conclusion drawn from what he had said.'" Flores-de-Jesús, 569 F.3d at 24 n.8 (quoting Casas, 356 F.3d at 119).

[14] Although testimony explaining why the investigation turned its focus to a particular defendant is rarely competent evidence on the principal question of whether the defendant is guilty, it can be useful to avoid jury confusion and speculation as to why agents suddenly began to conduct surveillance on the defendant. It can therefore be acceptable despite its lack of relevance to the question of guilt or innocence, so long as it does not involve communicating incompetent and prejudicial information to the jury. As we shall explain, the problems associated with evidence offered

-17-

In the way that matters to us here, however, this case is equivalent to Flores-de-Jesús and Casas. Appellants challenge only Cruz's testimony announcing their roles in the conspiracy. In Flores-de-Jesús, we characterized the agent's role-in-the-offense conclusion as "[t]he most troubling part" of his testimony. See 569 F.3d at 24. We observed that, "[w]hen a law enforcement witness 'express[es] opinions as to defendants' culpability based on the totality of information gathered in the course of their investigation[],' these conclusory statements often involve impermissible lay opinion testimony, without any basis in personal knowledge, about the role of the defendant in the conspiracy." Id. at 19 (quoting United States v. Garcia, 413 F.3d 201, 211 (2d Cir. 2005) (second and third alterations in original)).

Cruz's opinion on the defendants' roles was flawed in part by just such a lack of personal knowledge. As the district court pointed out, Cruz did not see or hear the only explicitly inculpatory conduct attributed to appellants – the interaction of Mieses and Reyes-Guerrero with Rubis and Torres at the minivan. Cruz admitted that his knowledge of appellants' interaction with Rubis and Torres came solely from Torres: "The informant is the only one that can declare as to what happened there." Inevitably, Torres's report about what he had observed inside the vehicle – the

to show the context of law enforcement actions can involve violations of the hearsay rule or the Sixth Amendment. See infra Part II.B.

-18-

most harmful evidence in the case – was part of Cruz's calculus in ascribing roles to the defendants in the conspiracy.[15]

Hence, we agree with the district court that Cruz's challenged testimony failed, at least in part, to satisfy the requirement that lay opinions be "rationally based on the perception of the witness," Fed. R. Evid. 701(a). As the Second Circuit has noted, the "'traditional objective'" of Rule 701 is "to afford the trier of fact 'an accurate reproduction of the event' at issue." Garcia, 413 F.3d at 211 (quoting advisory committee note on 1972 Proposed Rules). Cruz neither saw nor heard the critical episode in the

---

[15] Before eliciting Cruz's opinion on Rubis's and appellants' roles, the prosecutor engaged in the following exchange with him:

Q: Did you listen to all the calls in this case?
A: Yes, sir.
. . .
Q: Did you have conversations with the informant [Torres]?
A: Yes, sir.
Q: Did you supervise the informant?
A: Yes, sir.
Q: Did you listen to the audio recordings of any meetings the informant had with [Rubis]?
A: Yes, sir.
Q: And did you watch the two meetings that we viewed here today?
A: Yes, sir.

The prosecutor then asked what role each of the three men had played, "[b]ased on everything you observed." In the context of the questioning, a jury would almost surely understand that Cruz's response to this question was informed not only by what he had "observed," but also by what he had heard in the audio recordings and what he had learned from his conversations with Torres, including an account of what happened in the minivan. As we explain infra, even if that assumption is incorrect, the result here would be the same.

-19-

investigation, and his opinions as to defendants' roles in the conspiracy, based in part on <u>Torres's</u> perceptions of the interaction, were thus inadmissible under Rule 701(a).[16]

Even if the government could argue that Cruz was capable of inferring appellants' roles based only on what he had personally observed, his testimony would still be impermissible because it did not satisfy Rule 701's requirement that lay opinion evidence be "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701(b). The nub of that requirement is to exclude testimony where "'the witness is no better suited than the jury'" to make the judgment at issue, <u>United States</u> v. <u>Kornegay</u>, 410 F.3d 89, 95 (1st Cir. 2005) (quoting <u>United States</u> v. <u>Jackman</u>, 48 F.3d 1, 5 (1st Cir. 1995)), providing "'assurance[] against the admission of opinions which would merely tell the jury what result to reach,'" <u>United States</u> v. <u>Kaplan</u>, 490 F.3d 110, 118 (2d Cir. 2007) (quoting <u>United States</u> v. <u>Rea</u>, 958 F.2d 1206, 1215 (2d Cir. 1992) (quoting Fed. R. Evid. 704 advisory committee's note on 1972 Proposed Rules)).

---

[16] Indeed, the government's attempt on appeal to justify Cruz's testimony as lay opinion within the scope of Rule 701 is inconsistent with its argument at trial. When the defense objected to the offer of Cruz's interpretation of the events, the government responded: "This witness was supervising the informant. He told him exactly what to do. He was on surveillance many, many times. He heard the phone calls. . . . So he's a fact witness." Given Cruz's lack of personal knowledge and other problems discussed <u>infra</u>, his role-in-the-offense testimony did not qualify as either fact evidence or proper lay opinion.

Cruz had no insight to offer the jurors based on personal knowledge of the appellants' inculpatory conduct. Like them, he had to rely on Torres's account of what occurred in the vehicle. Like them, he heard the audio recordings of the phone calls. Although he was present at the scene when surveillance videotapes were recorded, the jurors watched the tapes of those encounters, allowing them to see what Cruz had seen. Indeed, when asked on cross-examination why he concluded that Mieses was a buyer, Cruz responded: "Because Mr. Meises and Mr. [Reyes-]Guerrero were the two that were in custody of the money at the time of the intervention. They were the two that were protecting that money so nothing would happen to it." In other words, Cruz inferred appellants' roles not from any direct knowledge, but from the same circumstantial evidence that was before the jury – effectively usurping the jury's role as fact-finder.[17] Moreover, as used by the government, the testimony amounted to argumentative interpretation. It was perfectly appropriate for the prosecutor to argue in summation that the evidence of the defendants' actions and words supported the inference that they were the buyers. But having Cruz so testify amounted to simply dressing up argument as evidence.

---

[17] Notably, Cruz's explanation relied on two levels of inference beyond the undisputed fact that appellants arrived in the vehicle with the cash: first, that appellants were guarding the money and, second, that the money belonged to them. Neither inference was based on conduct observed by Cruz.

The difference between Cruz's information and the base of knowledge necessary to make a lay opinion helpful to the jury in a case such as this is apparent when the circumstances here are contrasted with a scenario described by the Second Circuit in Garcia:

> [W]hen an undercover agent participates in a hand-to-hand drug exchange with a number of persons, the agent may well testify that, in his opinion, a particular participant, "X," was the person directing the transaction. Such an opinion is based on his personal perception of such subjective factors as the respect various participants showed "X," their deference to "X" when he spoke, and their consummation of the deal only upon a subtly signaled approval by "X." By allowing the agent to state his opinion as to a person's role in such circumstances, Rule 701 affords the jury an insight into an event that was uniquely available to an eyewitness.

413 F.3d at 211-12. Cruz, as he admitted himself, was not an eyewitness with unique access to appellants' conduct; his testimony could only have replaced, rather than aided, the jury's assessment of the evidence.[18] It was thus not admissible lay opinion testimony. See Garcia, 413 F.3d at 213-14 (explaining that jurors are not "'helped' within the meaning of Rule 701 by opinion testimony that, in addition to telling them 'what was in the evidence,' also told them 'what inferences to draw from it'" (quoting United States v. Grinage, 390 F.3d 746, 750 (2d Cir.

_____

[18] We note that the opinion of the law enforcement agent described by the court in Garcia concerns an individual's observable role in relation to other participants at the scene of a drug transaction, not the individual's overall role in the conspiracy. The latter would be more likely to rest on evidence beyond the agent's perceptions at the scene.

-22-

2004)); see also 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 701.05 (Joseph M. McLaughlin, ed., 2d ed. 2011) (noting that, to protect the jury's role as fact-finder, courts must be wary of lay opinion testimony whose "sole function is to answer the same question that the trier of fact is to consider in its deliberations"); Garcia, 413 F.3d at 210-11.

The usurpation problem that arises when a witness testifies to opinions based on evidence that was also available to the jurors is compounded when the witness is a government agent whose testimony – as here – is effectively a judgment on the question of guilt or innocence.  This is one variant of the imprimatur problem we described in Flores-de-Jesús and Casas.  There, we focused primarily on our concern that the government agent's preview of other witnesses' testimony would endorse their testimony "in what can only be viewed as an attempt by the government to bolster the credibility of those later witnesses."  See Flores-de-Jesús, 569 F.3d at 26; see also id. at 17-19; Casas, 356 F.3d at 120.[19]

Although the vouching concern also exists here to the extent that Cruz's role-in-the-offense opinion implicitly endorsed Torres's later testimony describing appellants' conduct in the

<hr>

[19] As we observed in Flores-de-Jesús, the government is particularly eager for such testimony in drug conspiracy cases "where so much of the government's case relies on the often problematic testimony of confidential informants with unsavory pasts or cooperating co-defendants with myriad credibility problems."  569 F.3d at 26-27.

-23-

minivan, the problem with Cruz's testimony extends beyond vouching for what the jury may perceive as a less credible witness. The jurors were told that, based on the same evidence before them, an experienced government agent had rejected appellants' mere presence defense and concluded that they were participants in the conspiracy. Given the effect on juries of the government's imprimatur, see Flores-de-Jesús, 569 F.3d at 18; Casas, 356 F.3d at 120, it was patently unfair for Cruz to present his view of appellants' culpability. "It is . . . the jury's singular responsibility to decide from the evidence admitted at trial whether the government has carried its burden of proof beyond a reasonable doubt." Garcia, 413 F.3d at 215; see also Grinage, 390 F.3d at 751 ("[T]he agent was presented to the jury with an aura of expertise and authority which increased the risk that the jury would be swayed by his testimony, rather than rely on its own interpretation . . . .").[20]

In sum, Cruz's testimony about appellants' roles in the June 27 transaction lacked a foundation of personal knowledge of facts essential to his opinion, usurped the jury's fact-finding function,

_____

[20] Cruz's law enforcement experience, of course, was not an appropriate basis for his opinions as a lay witness. See Garcia, 413 F.3d at 216-17. Nor would the opinion have been proper if Cruz had been qualified as an expert, which he was not. As we said about similar testimony in Casas, Cruz's "testimony that particular persons were members of the conspiracy was not an appropriate subject for expert testimony." 356 F.3d at 120.

and improperly endorsed the government's theory of the case. Hence, it is beyond debate that the testimony was wrongly admitted.

**B. Cruz's Testimony about the Post-Arrest Interview of Rubis**

1. Background

During cross-examination of Agent Cruz, Reyes-Guerrero's counsel elicited the fact that Reyes-Guerrero was not a target of the Task Force investigation until the day of the arrests. Cruz specifically acknowledged that Reyes-Guerrero's name did not appear in the four or five official investigative reports – known as "DEA-6 reports" – that were prepared before that day. On redirect examination by the government, Cruz confirmed that Reyes-Guerrero's name did appear in the last such report, "the arrest report." When the prosecutor followed up by asking about the contents of that report, defense counsel objected and the court convened a bench conference.

The final DEA report described the post-arrest interview of Rubis by Cruz and another Task Force agent. In the bench conference, the prosecutor explained that he would not try to "elicit the actual statements" uttered by Rubis in the interview, apparently recognizing that such testimony would trigger hearsay and Confrontation Clause problems. Rather, he would ask about Rubis's offer to cooperate, whether he was interviewed outside the presence of the others, "[a]nd what did [Cruz] do after the meeting was over." Reyes-Guerrero's counsel protested that evidence about

-25-

the interview would be hearsay because the prosecutor was "trying to establish the truth of the matter asserted," and he emphasized that "Rubis is not here."

The district court, after suggesting that any statement from Rubis would be admissible as a statement by a co-conspirator,[21] allowed the prosecutor to proceed. The following exchange then occurred:

> Q: Agent Cruz, the DEA-6 that I just asked you about, without saying what is in that DEA-6, specifically, the whole report, what's it about?
> A: That report is an interview that was made to Mr. Rubis Dario after the arrest.
> Q: After all three were arrested?
> A: Yes, after all three were arrested.
> . . .
> Q: Okay. Where were these two individuals while you were interviewing him?
> A: These two individuals were in the cell at the office.
> Q: Why were they not in the interview?
> A: Because the interview was being carried out with Mr. Rubis only and with us because he had the intention of cooperating with us.
> Q: After this interview, did the targets of your investigation at this point change?
> A: Yes, sir.
> Q: Okay. After this interview, what did you decide to do with Defendant [Reyes-Guerrero]?

Cruz then testified that the defendants were processed and taken to a federal detention facility.

---

[21] There is no question that the hearsay exception for co-conspirator statements made "during the course and in furtherance of the conspiracy," Fed. R. Evid. 801(d)(2)(E), does not apply to Rubis's post-arrest statements. See United States v. Lombard, 72 F.3d 170, 189 n.25 (1st Cir. 1995).

On appeal, appellants argue that Cruz implicitly testified that Rubis had identified them as co-conspirators, and they assert that the indirect admission of Rubis's statement violated their rights under the Confrontation Clause of the Sixth Amendment, as described in Crawford v. Washington, 541 U.S. 36 (2004). Under Crawford, the admission of testimonial hearsay against a defendant is prohibited unless the declarant is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine him. Id. at 68; United States v. Castro-Davis, 612 F.3d 53, 64 (1st Cir. 2010). Although Rubis was unavailable, having become a fugitive, appellants had no prior opportunity to question him about his interview statements.[22]

We begin our assessment of this claim with the government's contention that the Crawford issue was not preserved.

2. Forfeiture

The government argues that neither appellant may pursue a Confrontation Clause challenge on appeal because Reyes-Guerrero objected at trial on hearsay grounds, without referencing the Confrontation Clause or Crawford, and Mieses did not object at all.

_____

[22] Mieses mistakenly invokes Bruton v. United States, 391 U.S. 123 (1968), which addresses the admission of a non-testifying codefendant's out-of-court statements in a joint trial. Rubis was not tried with Mieses and Reyes-Guerrero, and "a literal Bruton objection" therefore "ma[kes] no sense." United States v. Cabrera-Rivera, 583 F.3d 26, 36 (1st Cir. 2009). We thus construe his Confrontation Clause claim as a Crawford challenge. See id.

We can easily dispatch the argument as to Reyes-Guerrero. Although the government accurately recites our precedent holding that an objection on hearsay grounds will not preserve a Confrontation Clause claim, see United States v. Rivera-Rodríguez, 617 F.3d 581, 594 (1st Cir. 2010), we have in the past looked to the full context of counsel's colloquy with the court in determining whether a Crawford challenge was preserved. In Cabrera-Rivera, for example, we found it "obvious that counsel was objecting to [defendant's] inability to confront the declarant" where counsel had pointed to the declarant's unavailability at trial. See 583 F.3d at 36 (citing counsel's statement that the declarant "is not here to --"). We therefore concluded that the defendant had preserved his Confrontation Clause claim. Here, too, counsel plainly raised both hearsay and Confrontation Clause concerns. See, e.g., Tr. Transcript (Feb. 19, 2009), at 10 ("Because Rubis is not here, and . . . the attorney is trying to establish the truth of the matter asserted because of this.") (emphasis added); id. at 10-11 ("There's a . . . thin line, your Honor, and it might . . . this hearsay information, your Honor, we don't know which context it happens; and, also, Mr. Rubis, again, is not here.") (emphasis added).[23]

---

[23] As a practical matter, the same underlying concerns would be at play if we addressed the testimony at issue here solely as a hearsay problem, see United States v. Gomez, 617 F.3d 88, 96-97 (2d Cir. 2010), and we would reach the same outcome. See also United States v. Dukagjini, 326 F.3d 45, 56 n.6 (2d Cir. 2003) (noting

Mieses's counsel, by contrast, was largely silent throughout the exchange on this issue. He participated in the sidebar conference discussing the proposed testimony, however, and voiced his agreement that the prejudice from the line of questioning outweighed its probative value. In context, where the interests of both defendants were identical, we are satisfied that Mieses's counsel incorporated Reyes-Guerrero's more fully stated objection into his brief comment.

We thus afford plenary review to both appellants' claims. We generally review preserved evidentiary errors for abuse of discretion, but "[w]e review de novo whether the strictures of the Confrontation Clause have been met." Rivera-Rodríguez, 617 F.3d at 590 (internal quotation marks omitted).

3. Analysis

Out-of-court statements excluded from evidence under Crawford must be both testimonial – i.e., statements an objectively reasonable declarant could have anticipated would be used at trial – and offered for their truth, thus constituting hearsay. Crawford, 541 U.S. at 51-52; id. at 59 n.9; Castro-Davis, 612 F.3d at 65. It is not disputed that Rubis's assertions in his post-

---

that the hearsay rules and the Confrontation Clause "'are generally designed to protect similar values,'" though "the Supreme Court has 'been careful not to equate' them" (quoting Idaho v. Wright, 497 U.S. 805, 814 (1990)); Ryan v. Miller, 303 F.3d 231, 247 (2d Cir. 2002) ("[A]ccusatory assertions introduced without the testimony of the accuser not only violate the Confrontation Clause, but they also violate rules against hearsay.").

arrest interview were testimonial.  The government also appears to accept that testimony revealing an "actual statement[]" by Rubis about appellants' complicity in the drug deal would be inadmissible hearsay.  It seeks to defeat appellants' <u>Crawford</u> claim on two other grounds: (1) no actual statement, and thus no improper hearsay, was introduced into evidence, and (2) Reyes-Guerrero's counsel opened the door to the challenged testimony.[24]

### a.  No Statement

In the pertinent portion of the challenged exchange, Cruz was asked, in essence, if Rubis had said anything during his interview that changed the targets of the investigation and prompted the defendants' arrests.  Cruz answered affirmatively.  The government maintains that the prosecutor's examination was "adroitly focused . . . on the actions that Agent Cruz took after speaking to Rubis,"

___

[24] The government cites precedent for the proposition that "[s]tatements offered for the limited purpose of showing what effect the statement had on the listener are not hearsay," but it makes no direct argument that we should view any statement by Rubis as nonhearsay.  <u>See</u> Brief of the United States at 53 (citing <u>United States</u> v. <u>Cruz-Díaz</u>, 550 F.3d 169, 176 (1st Cir. 2008); <u>United States</u> v. <u>Bailey</u>, 270 F.3d 83, 87 (1st Cir. 2001)).  Instead, in the sentence immediately following its citations to <u>Cruz-Díaz</u> and <u>Bailey</u>, the government asserts that "[t]here was no violation here because Rubis's statement was not introduced."  Even if we were to generously view the government to be arguing, alternatively, that admission of Rubis's statement was permissible because it was not offered for the truth of the matter asserted, that argument would be unavailing.  As we shall explain, the government offered the evidence about Cruz's interview of Rubis to rebut an inference that Reyes-Guerrero was not a participant in the crime – i.e., for the truth of Rubis's implicit statement that Reyes-Guerrero and Mieses were involved.

while appellants argue that "[n]o juror of normal intelligence, hearing this exchange, could have failed to get the prosecutor's point that Rubis, in his statement to the agents, had implicated [him] as a co-conspirator." Reyes-Guerrero Brief at 21; see also Mieses Brief at 32. Appellants assert that "the import of this testimony is no less clear than if Rubis had been directly quoted." Reyes-Guerrero Reply Brief at 5.

We agree with appellants that a reasonable jury could only have understood Cruz to have communicated that Rubis had identified appellants as participants in the drug deal. It makes no difference that the government took care not to introduce Rubis's "actual statements." Although the government could properly seek to rebut Reyes-Guerrero's suggestion that the appellants were innocent bystanders, it did so with testimony that plainly told the jurors that Rubis said they were co-conspirators rather than with the available evidence circumstantially pointing to their culpability.

In United States v. Maher, 454 F.3d 13 (1st Cir. 2006), we declined to discuss Crawford's applicability to "testimony from which . . . the jury would necessarily infer that the declarant had said *X*, but which did not itself quote or paraphrase the declarant's statements." Id. at 20-21. We observed that the defendant in that case had made "no effort to explain why Crawford should be read to extend" to such statements. Id. at 21. Here,

the issue is addressed head-on by both appellants.  We conclude that the right to cross-examine an out-of-court accuser applies with full force in the circumstances of this case.

The opportunity to cross-examine the declarant "to tease out the truth," Crawford, 541 U.S. at 67, is no less vital when a witness indirectly, but still unmistakably, recounts a co-defendant's out-of-court accusation.  The concerns animating the right to confrontation are especially acute when the statement at issue originates from an ex parte examination by a law enforcement officer.  See Crawford, 541 U.S. at 50-51; id. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").  Hence, if what the jury hears is, in substance, an untested, out-of-court accusation against the defendant, particularly if the inculpatory statement is made to law enforcement authorities, the defendant's Sixth Amendment right to confront the declarant is triggered.  Accord Ryan v. Miller, 303 F.3d 231, 249 (2d Cir. 2002) ("If the substance of the prohibited testimony is evident even though it was not introduced in the prohibited form, the testimony is still inadmissible."); United States v. Reyes, 18 F.3d 65, 69 (2d Cir. 1994) ("[A]lthough the jury was not told exactly what words [the co-defendants] had spoken, [the witness's] testimony clearly conveyed the substance of what they had said.").

Indeed, any other conclusion would permit the government to evade the limitations of the Sixth Amendment and the Rules of Evidence by weaving an unavailable declarant's statements into another witness's testimony by implication.[25] The government cannot be permitted to "circumvent the Confrontation Clause by introducing the same substantive testimony in a different form."  <u>Ryan</u>, 303

---

[25] This risk of violation of the hearsay rule or the Confrontation Clause reinforces the importance of prosecutors understanding the limitations on so-called background or context evidence.  If, for example, such evidence includes the fact that a known participant in the crime was observed conferring in suspicious circumstances with the defendant, it can be useful and acceptable for the investigating agent to explain that he began to watch the defendant because of this observed meeting.  It does not follow, however, that the objective of explaining why the agent focused on the defendant – or why the agent proceeded to arrest the defendant – justifies prejudicial hearsay testimony.  <u>See</u> <u>Maher</u>, 454 F.3d at 20 ("[I]nvestigating officers . . . should not . . . be allowed to relate historical aspects of the case, such as complaints and reports of others containing inadmissible hearsay.  Such statements are sometimes erroneously admitted under the argument that the officers are entitled to give the information upon which they acted.").

We take it to be common ground that the government may not have an agent testify, "X told us that the defendant was involved in the crime."  Quoting X's out-of-court accusation remains impermissible if the agent's testimony is changed to say, "We began to investigate the defendant because X told us that the defendant was involved in the crime," and the government seeks to justify it by arguing that X's out-of-court statement was offered not for its truth but only to explain why the agent focused on (or arrested) the defendant.  Nor does the result change if, instead of <u>quoting</u> the out-of-court statement, the government communicates its content to the jury by implication.  In such instances, the relatively minor "probative value [of the evidence of why the agent began surveillance or made an arrest] is substantially outweighed by the danger of unfair prejudice" that results from communicating the accusatory hearsay to the jury.  Fed. R. Evid. 403; <u>see</u> <u>also</u> <u>Maher</u>, 454 F.3d at 20 ("The need for this evidence is slight, and the likelihood of misuse great." (quoting 2 Broun, et al., <u>McCormick on Evidence</u> § 249, at 103 (5th ed. 1999)(emphasis omitted)).

F.3d at 248; see also, e.g., Mason v. Scully, 16 F.3d 38, 43 (2d Cir. 1994) ("The fact that the content of [the co-conspirator's] statement to [the detective] was not revealed in detail was immaterial, for the plain implication that the prosecutor sought to elicit . . . was that the conversation . . . led the police to focus on [the defendant]."); People v. Cruz, 474 N.Y.S.2d 142, 144 (N.Y. App. Div. 1984) ("The prosecutor's questioning of [the witness] concerning a conversation with [a non-testifying witness], which directly preceded [the witness's] testimony that he made two arrests in the case was improper inasmuch as it was designed to create the impression in the jurors' minds that [the non-testifying witness] had implicated the defendant . . . ."); People v. Felder, 485 N.Y.S.2d 576, 577 (N.Y. App. Div. 1985) (finding error where witness testified that "the complainant made a response following which 'we patted down both subjects, placed them in handcuffs, and removed them from the bar,'" because "[e]ven though [the complainant's] response was not admitted into evidence, the testimony left the jurors with the clear impression that . . . the arrests were made as a result of this response").

We therefore reject the government's argument that Cruz's testimony was proper because it omitted "the actual statements" made by Rubis. See Maher, 454 F.3d at 23 ("[W]e are on firm ground in warning prosecutors of the risks they face in backdoor attempts

-34-

to get statements by non-testifying confidential informants before a jury.").

### b.  The Opened Door

The government suggests that, even if Cruz's testimony about the interview indirectly resulted in the introduction of an out-of-court statement, the testimony was nonetheless proper to rebut Reyes-Guerrero's cross-examination eliciting the fact that the two defendants were never mentioned in the investigative reports prior to the incident at the van.  In the sidebar discussion following Reyes-Guerrero's objection at trial, the prosecutor stated that he had avoided referring to the interview in his direct questioning but defense counsel's focus on Reyes-Guerrero's absence from the DEA reports had triggered a need for the testimony.

The government's argument on this issue borders on the frivolous.  The testimony elicited by Reyes-Guerrero's counsel about the early DEA reports was proper evidence in support of appellants' mere presence defense, showing that appellants had not previously been known to law enforcement authorities.  The government does not explain in its brief how that testimony opened the door to evidence on the content of Rubis's interview.  At trial, the prosecutor asserted that the evidence was necessary rebuttal because, in context, the questioning on the early reports was "diminishing [appellants'] culpability."  That may be. Defendants are entitled to cross-examine government witnesses in an

effort to diminish their own culpability, and the government is entitled to counter with appropriate rebuttal evidence. The evidence of appellants' absence from the earlier reports was neither inaccurate nor misleading, and the government did not contend otherwise. The government could properly have countered by showing, for example, that appellants did appear in the final report, which was prepared after the incident at the van and described the transaction. By no means, however, did the cross-examination testimony require or justify rebuttal that violated the Confrontation Clause.

Moreover, the government's rationale essentially acknowledges that the evidence of Rubis's accusation of complicity was offered to establish the truth of the accusation – i.e., that appellants <u>were</u> participants in the drug transaction, notwithstanding the silence of the early reports. Hence, admission of Cruz's testimony about the interview was improper.

**C. Harmless Error**

Both appellants argue that the errors described above entitle them to a new trial. Reyes-Guerrero asserts that admission of Cruz's overview testimony and the indirect admission of Rubis's out-of-court statements each is reversible error on its own, and Mieses additionally argues that the multiple errors require the grant of a new trial under the cumulative error doctrine. <u>See</u>

United States v. Meserve, 271 F.3d 314, 331-32 (1st Cir. 2001); United States v. Sepúlveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993).

The inquiry to determine whether cumulative errors are harmless is the same as for individual error, Meserve, 271 F.3d at 332, and we therefore think it most efficient to move beyond individual analyses of harmlessness to consider the combined effect of the two erroneously admitted portions of Cruz's testimony. "The admission of improper testimony is harmless if it is 'highly probable that the error did not influence the verdict.'" Flores-de-Jesús, 569 F.3d at 27 (quoting Casas, 356 F.3d at 121).[26] The government bears the burden to establish harmlessness, id., and the inquiry requires a case-specific examination of factors that include "the centrality of the tainted material," its prejudicial impact, and any other indications that "the error affected the factfinder's resolution of a material issue." Sepúlveda, 15 F.3d at 1182 (quoted in Flores-de-Jesús, 569 F.3d at 27); see also Cabrera-Rivera, 583 F.3d at 36.

Without question, as we described in addressing Reyes-Guerrero's sufficiency claim, there was ample evidence aside from

---

[26] Constitutional errors, such as a Confrontation Clause violation, require reversal unless shown to be harmless beyond a reasonable doubt. See Cabrera-Rivera, 583 F.3d at 36. In this case, we use the non-constitutional standard that is more favorable to the government because our harmless error analysis embraces both constitutional and non-constitutional errors. The government is unable to meet that easier test for showing harmlessness and, hence, it could not meet the more exacting constitutional standard.

Cruz's improper testimony from which a reasonable factfinder could infer that appellants played the roles that Cruz and Rubis attributed to them. We strongly doubt, however, that the jury was unaffected by Cruz's improper testimony, which communicated to the jurors that Cruz, an experienced drug investigator, and Rubis, who admitted his guilt, had both identified appellants as participants in the conspiracy. We have recognized the "'devastating'" impact of a co-defendant's extrajudicial statements, Cabrera-Rivera, 583 F.3d at 37 (quoting Bruton, 391 U.S. at 136), and an essential premise of our warnings about overview evidence is that jurors view the testimony of law enforcement officers as especially authoritative, see Flores-de-Jesús, 569 F.3d at 17-18.

Importantly, the prosecution depended heavily on the believability of Torres, a paid government informant. In evaluating harmless error, we cannot presume the jury would have accepted his testimony as readily without the corroboration provided by Cruz's testimony. Indeed, consistent with standard practice for informant witnesses, the court instructed the jurors to consider Torres's testimony with caution. See Flores-de-Jesús, 569 F.3d at 26 (noting the "often problematic testimony of confidential informants with unsavory pasts").

The other evidence of appellants' knowing involvement was suggestive, but not overwhelming. In recorded calls on the day of the arrests, Rubis said he was with the buyers, but he did not

identify them by name. Mieses and Reyes-Guerrero were seated in the front of the minivan, while the known conspirator – and the money – were in the back. That vehicle, with its hidden compartment, was not registered to either appellant, and the compartment was not visible to the driver or passengers.[27] Cruz testified that the video taken of the attempted drug deal does not show Mieses talking at all – despite Torres's testimony that Mieses made several incriminating statements. The jury in fact heard none of the recorded conversations among the men that day – including Rubis's statement, reported by Torres, that the owners of the money were in the car – because the audio recording was not introduced into evidence.

The government's heavy reliance on the informant's credibility made the overview evidence particularly damaging in this case. In effect, the jurors were told it was unnecessary to make their own assessment of Torres's credibility because Cruz did it for them when he announced unequivocally that appellants were "the owners" of the money. Rubis's accusation validated Cruz's assessment. See United States v. Gomez, 617 F.3d 88, 97 (2d Cir. 2010) ("The improperly admitted evidence had substantial weight precisely

---

[27] The minivan was inspected by DEA Task Force Agent Victor Javier Salgado-Betancourt, who was trained to find secret compartments in motor vehicles. He testified that the hidden compartment he discovered was designed to open only when several buttons or components inside the vehicle were activated at the same time.

because it went to the core of the government's case against [the defendant], placing an unimpeachable accusation before the jury.").

In sum, the tainted evidence was central to the prosecution's case and potentially disastrous to the appellants' defense of mere presence. The contested statements were not "'cumulative of other compelling proof'" that the defendants "'committed the charged [crime],'" United States v. Earle, 488 F.3d 537, 546 (1st Cir. 2007) (alteration in original) (quoting United States v. Barthelho, 129 F.3d 663, 670 (1st Cir. 1997)); rather, Cruz's testimony sealed any gap the jury may have perceived between the circumstantial evidence and a finding of guilt. Hence, we cannot say that it is "highly probable" that the errors did not affect the jury's resolution of the case and, accordingly, we conclude that appellants are entitled to a new trial.

**D. Exclusion of the Audiotape**

Our conclusion that appellants' convictions must be vacated based on the overview and Sixth Amendment errors makes it unnecessary to rule on Mieses's contention that the district court erred in excluding the audio recording made by informant Torres on the day of the arrests. Because the issue is likely to arise again in the new trial, however, we see value in examining this claim.

Torres testified that Mieses made several incriminating statements during their encounter at the van,[28] and Mieses's counsel sought to cross-examine Torres with the recording, which all parties agreed did not contain either defendant's voice. When counsel asked for a ten-minute break during cross-examination to find the relevant portion of the one-hour recording, the government objected that the tape was incomplete and therefore both misleading and prejudicial. The prosecutor also protested that the recording was inadmissible without an English translation. The court rejected admission of the recording, stating: "I don't see any reason why I should admit this tape . . . . [T]his is too little, too late."

Mieses's counsel again urged admission of the recording following the government's redirect examination of Torres. Counsel emphasized that "[t]he most important factor in this case is what was said inside that van," and "the most important thing is that the voice[s] of the Defendants are not heard there." The court listened to the recording at counsel's request, but then reaffirmed its initial decision, noting that it was "clear from all the testimony" that the defendants' voices were "not heard in any tape."

---

[28] As described in Section I, Torres testified that Mieses reported that the shoe box in the van contained $100,000, and he asked Torres about "the merchandise," as well as "how are we going to do this."

-41-

Mieses presses an argument on appeal that was implicit in the objections raised at trial, but not fully articulated there. He argues that the crucial aspect of the recording is not that the defendants' voices are absent – a fact that no one disputes. Rather, he asserts that the jurors needed to hear the recording so they could decide whether – as Torres claimed – the audio was faulty, or whether Torres had fabricated the exchange in the minivan. Stressing the plausibility of the latter view during oral argument on appeal, defense counsel noted that, at a minimum, the recorder should have picked up the statements that Torres claimed to have made to appellants.[29] Mieses insists that a translated transcript of the recording should not have been a prerequisite for its admission because the issue was not what was said on the tape, but why the conversation described by Torres was not there – a question of recording quality, not content.

Indeed, the government made much of the supposedly faulty equipment in its closing argument, emphasizing that the critical conversation was unavailable to be played for the jurors through no fault of its own:

> Couldn't get an audio of it. Agent Cruz explained to you why. The wind was blowing. The equipment didn't half work. . . . Electronics are that way. This equipment is not perfect. People are not perfect. And how many times in this trial did our equipment not work? How many times

---

[29] When asked what is audible on the tape, counsel stated that Torres and Rubis could be heard talking as they approached the van and as they walked away from the van.

> does your cell phone drop a call?  Think about your
> common experience as an individual.
>
> We could not get what happened in that van on audio.
> Sure, I'd love to be able to play that to you.  But that
> doesn't take away what the informant – the man that sat
> there – who was cross-examined for hours and hours and
> hours.  He didn't want to be here.  His family didn't
> want him here.  You heard the testimony.  But he
> testified to you what exactly went on in that van.

Mieses's claim of error, briefly stated, is that exclusion of the audio recording compromised his ability to respond to this argument.

As noted, we need not decide whether the district court, which received an imperfect articulation of Mieses's claim, abused its discretion in excluding the audiotape.  We observe, however, that the absence of defendants' voices on the recording was potentially significant evidence rebutting Torres's incriminating account of their behavior.  The government and the defense argue different reasons for the recording device's failure to pick up Reyes-Guerrero's and Mieses's voices.  We see little reason why the correct explanation should not be a jury question, as to which the sounds captured on the tape itself might be potent evidence.  Assuming the lack of an English transcript of the recording was adequate reason for the exclusion, defendants can prepare a transcript before their retrial.

## IV.

For the reasons set forth above, we vacate the judgments of conviction and remand to the district court for further proceedings.

So ordered.